# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| IN RE ESTATE OF LILLIAN CORA JOHNSON, | ) ) ) | No. 76652-0-I |
| Deceased | ) ) | |
| MARION JOSS, by and through her attorneys-in-fact, HAROLD and SANDRA JOSS, | ) ) ) ) | |
| | ) | DIVISION ONE |
| Appellants, | ) ) | |
| v. | ) ) | |
| MICHELLE CAMPBELL, | ) | UNPUBLISHED OPINION |
| | ) | |
| Respondent. | ) | FILED: July 9, 2018 |

SPEARMAN, J. — Where the owner of a bank account has designated another person as joint tenant with right of survivorship, there is a statutory presumption that, upon the death of one co-owner, funds in the account pass to the surviving co-owner. This presumption may only be overcome by clear and convincing evidence of contrary intent at the time the account was created.

Lillian Johnson designated a relative, Michelle Campbell, as joint tenant with right of survivorship in 2010 and again in 2012. In 2012, Johnson designated another relative, Marion Joss, as payable on death beneficiary. Johnson died in 2014 and the accounts passed to Campbell. Joss brought this action asserting

that she was the rightful beneficiary of the accounts under several theories. But Joss failed to produce evidence establishing a prima facie claim. The trial court did not err in granting summary judgment to Campbell. We affirm.

## FACTS

Lillian Johnson was the eldest of five sisters and had a large extended family. She stayed in touch with many relatives. Johnson's sister, Marion Joss, often visited her. A second cousin, Michelle Campbell, also visited Johnson.

Johnson did not drive and she relied on her husband for transportation. When Johnson's husband died in 2009, Campbell began providing much of her transportation. Johnson sometimes performed errands on foot, but Campbell regularly took her grocery shopping and to appointments. Joss gave Johnson rides when Campbell was unavailable. At the time Johnson was widowed, she was 88 years old, Joss was 87, and Campbell was 60.

In April 2010, Johnson suffered a stroke and spent ten days in a rehabilitation facility. Johnson's medical record from this time state that she had a "waxing and waning of confusion." Clerk's Papers (CP) at 33. The records also describe Johnson as alert, competent to execute directives, and able to self-manage medications. Staff in the rehabilitation facility encouraged Johnson to execute a power of attorney. Johnson named Campbell attorney in fact and made Joss the alternate. Following her discharge, Johnson continued to live independently.

In May 2010, Johnson met with an attorney, Karl Flaccus, to discuss her estate. Flaccus's notes from the meeting include an estate planning

questionnaire and a separate page listing the names of Johnson's sisters and Campbell's name and address. According to the questionnaire, Johnson intended to name her four sisters as beneficiaries. Flaccus drafted a will in favor of Johnson's sisters. Flaccus did not hear from Johnson again. There is no evidence that Johnson signed the will. Nor did the will dispose of the accounts at issue in this case.

In September 2010, Johnson added Campbell as a joint tenant with right of survivorship (JTWROS) to her Bank of America accounts. The signature card describes the accounts as "the property of each co-owner as joint tenants with right of survivorship and payable to either co-owner or to the surviving co-owner(s) if a co-owner dies." CP at 366. Johnson and Campbell both signed the signature card. Campbell later stated that she did not recall being added to Johnson's accounts in 2010 and did not understand the significance. The record contains no other evidence concerning this transaction.

In April 2012, Johnson, Campbell, and Joss went to Bank of America together. Johnson and Campbell executed new signature cards again naming Campbell as JTWROS. As in 2010, the forms describe the accounts as the property of each co-owner and payable to the surviving co-owner if one co-owner dies. Johnson, Campbell, and Joss executed a form making Joss the payable on death (P.O.D.) beneficiary. Campbell and Joss both stated that they did not read the forms, no one explained them, and they did not understand the significance of the JTWROS and P.O.D. designations.

Johnson suffered another stroke in May 2014. Johnson was unable to speak for herself and Campbell made various decisions about her care. Johnson died in June 2014.

Campbell accessed the Bank of America accounts for the first time during Johnson's final illness. At that time, the accounts totaled about $430,000. Campbell wrote a check for $38 to pay Johnson's electricity bill. She later paid for Johnson's funeral from the Bank of America accounts.

After Johnson's death, Campbell, Joss, and other relatives learned that Johnson's bank accounts passed to Campbell as JTWROS. One of Johnson's nieces, Linda Claughton, believed this was a mistake. Based on the close relationship between Johnson and her sisters, Claughton believed Johnson intended the bank account to pass to Joss. One of Johnson's nephews, Bruce Fletcher, stated that he believed it "would make sense" for the accounts to go to Joss. CP at 137.

Family members discussed the accounts with a Bank of America employee, Dena Bainbridge. Bainbridge froze the accounts. She stated that Johnson once "mentioned that she wanted to make sure her sister Marion [Joss] was taken care of" and it was obvious to her that Johnson intended the accounts to go to Joss. CP at 140. Bainbridge's Bank of America manager later required her to unfreeze the accounts.

In September 2014, Bank of America informed Campbell that the accounts belonged to her and she began to draw on them. A short time later, the court appointed Claughton and Fletcher to administer Johnson's estate. Claughton and

4

Fletcher began investigating Campbell's expenditures. Campbell transferred the funds from Bank of America to her personal accounts at Chase Bank. Claughton and Fletcher filed a complaint asserting that, by transferring the funds out of Bank of America, Campbell had committed theft. The sheriff's office placed a freeze on Campbell's Chase accounts.

Joss provided a statement to a detective in the sheriff's office. The detective questioned Joss about Johnson's mental capacity in the years preceding her death. In response to a question as to whether Johnson needed help with bills and finances after she was widowed, Joss stated "No, Lillian [Johnson] was an intelligent person. She, finally in the last few years of her life she had a couple of strokes. She recovered fairly well from the first one [in 2010], the second one [in 2014] kind of did her in. . ." CP at 742. The detective stated "Ok, so, you think. . . she would be able to take care of her own finances[?]" Id. Joss replied "Oh, yeah." Id. Specifically as to events in 2010, Joss stated "I didn't know and I didn't worry about it. Lillian was a very independent person and she like[d] to give the orders and so forth, so I kept my nose out of it." Id. Joss further stated that "Lillian was a very bossy person and I didn't worry about her. Like I said she was independent. If she wanted something, she would sure let you know." Id. The prosecutor's office declined to bring charges and the freeze was removed from Campbell's Chase accounts.

In September 2016, Joss, through her attorneys in fact, filed the present action. Id. at 1-20. She asserted that Johnson intended her to inherit and Campbell exercised undue influence over Johnson. Joss provided a declaration

5

and an affidavit. In the declaration, Joss expressed doubt as to the frequency with which Campbell visited Johnson. Joss stated that she visited Johnson weekly but Campbell sometimes did not see Johnson for several weeks. According to Joss, Johnson did not particularly like Campbell.

As to the 2012 bank transaction, Joss stated that she went to the bank with Campbell and Johnson because Johnson wanted to get cash. Joss recalled signing papers but did not remember what they were for. Joss stated that Campbell "took over" and assisted her and Johnson with the paperwork. CP at 144.

Joss gave the same account of the bank visit in her affidavit, adding that no bank employee explained the forms. Joss also stated that Johnson used to rely on her husband to take care of finances, transportation, and major decisions. According to Joss, Campbell helped with those tasks and decisions after Johnson's husband died. Joss stated that she never asked Johnson about her estate plans but it "would have made sense" for Johnson to pass the accounts to her, Joss. CP at 264.

Campbell submitted to a deposition. Joss's attorney asked Campbell if she believed anyone had been taking advantage of Johnson. Campbell described one of Johnson's neighbor's, Roger, who used to ask Johnson for money. According to Campbell, she, Johnson's doctor, and employees at Bank of America were all concerned about Roger and told Johnson not to give him any more money. Campbell discussed Roger with both Johnson and Joss.

6

Campbell could not remember when she discussed Roger with Johnson and guessed it was in 2013. She also could not recall when she went to the bank with Johnson and Joss. Campbell later stated that she, Johnson, and Joss went to the bank after they discussed Roger. She indicated that they were "trying to get it so Roger couldn't get any checks." CP at 292. When they got to the bank, Johnson and the banker talked privately. The banker then brought documents and everyone signed them.

Campbell stated that it was Johnson's idea to go to the bank. The attorney asked Campbell if she had "an impression of why [Johnson] wanted to change the titles on the bank accounts?" CP at 291. Campbell replied "No. The bank told Lillian she had to get Roland off the account." Id. The attorney again asked if Campbell knew why Johnson added her to the accounts. Campbell replied "No, not really. To just help her, if she needed help." Id. The attorney asked if there was any discussion of whether Campbell would be a co-signer or joint tenant. Campbell replied "Just so I could sign stuff, if I needed to. I left Lillian with the banker to talk, and Marion [Joss] and I were sitting over on the sofa, so I don't know what they discussed." Id. Campbell did not remember any discussion of the difference between a co-signer and a joint tenant.

In responses to interrogatories, Campbell repeated that Johnson never told her why she added her to the bank accounts. Campbell thought it was to help Johnson with bills but Johnson never said that. Campbell did not help Johnson pay any bills until Johnson's final illness. According to Campbell, Johnson was "sharp," "knew what was going on", "managed her own finances,"

7

and "made up her own mind" until her final stroke. Id. at 779, 781. Campbell stated that "[p]eople did not tell [Johnson] what to do, she told other people what they should do." Id. at 781.

Relying on this record, the parties filed cross motions for summary judgment. After a hearing, the trial court granted summary judgment to Campbell. The court awarded Campbell a portion of her fees and costs.

## DISCUSSION

Joss contends the trial court erred because Johnson intended Joss, and not Campbell, to receive the bank accounts. We review a decision on summary judgment de novo, engaging in the same inquiry as the trial court. Lybbert v. Grant County, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000).

Under the Financial Institution Individual Account Deposit Act, chapter 30A.22 RCW, a joint tenancy with right of survivorship is "an account in the name of two or more depositors and which provides that the funds of a deceased depositor become the property of one or more of the surviving depositors." RCW 30A.22.040(10). The co-owners of a JTWROS account may designate a P.O.D. beneficiary. RCW 30A.22.050; RCW 30A.22.100(4). When an owner of a JTWROS account dies, the funds pass to any surviving co-owners or, if these have all died, to the P.O.D. beneficiary. RCW 30A.22.100(3), .100(4).

The statute thus creates a presumption that funds in a JTWROS account pass to the surviving owner. Taufen v. Estate of Kirpes, 155 Wn. App. 598, 602, 230 P.3d 199 (2010). The presumption may only be rebutted by clear and convincing evidence of contrary intent at the time the account was created. Id.

The clear and convincing standard heightens the burden on summary judgment. In re Estate of Jones, 170 Wn. App. 594, 603, 287 P.3d 610 (2012). To survive summary judgment, the challenging party must produce evidence that makes it highly probable she will prevail at trial. Id.

Joss contends there is clear and convincing evidence in the record that Johnson intended her, Joss, to receive the bank accounts.[1] Joss relies on the P.O.D. designation and argues that Johnson would not have made her P.O.D. unless Johnson intended her to inherit the accounts. And because Joss is unlikely to survive Campbell, Joss argues that while Johnson may have intended to make Campbell a co-signer on the account, she did not intend to name Campbell JTWROS.

We reject the argument for several reasons. By statute, an account may be both a JTWROS account and a P.O.D. account. RCW 30A.22.100(4). The designations are not inherently inconsistent. Here, Johnson made Campbell JTWROS in 2010 and again in 2012. And, at the same time Johnson executed the JTWROS form in 2012, she also executed the P.O.D. form. The argument that Johnson designated Campbell JTWROS by mistake is nothing more than speculation. It is not clear and convincing evidence that Johnson had a contrary intent at the time the account was created.

---

[1] Campbell argues that Joss lacks standing to bring this claim and Joss's related undue influence claim. She asserts that, if the 2012 JTWROS designation was invalid, the P.O.D. form executed at the same time was also invalid. In that case, she argues, the 2010 JTWROS form would control and the accounts would still pass to Campbell. We reject this argument because Joss contends that only the JTWROS form, and not the P.O.D. form, was invalid. Under this theory, Joss has an interest in an estate-related decision and thus has standing to bring a (Trust and Estate Dispute Resolution Action) (TEDRA) action. RCW 11.96A.080(1); RCW 11.96A.030(5)(i).

Joss next argues that the bank failed to explain the significance of the JTWROS form. She asserts that this failure renders the transaction ineffective and raises at least a question of fact as to Johnson's intent. The argument is without merit. The record is silent as to what information bank employees communicated to Johnson in 2010 and 2012.

Joss also argues that we may divine Johnson's intent from her unsigned will and from Campbell's statements. She is mistaken. The unsigned will is evidence only that Johnson considered devising her probate assets to her sisters but did not finalize that plan. The draft will makes no reference to Johnson's non-probate accounts. And Campbell stated that Johnson never discussed her intent for the accounts. Joss fails to point to any evidence that Johnson did not intend to designate Campbell JTWROS.[2] The trial court did not err when it concluded there were no issues of material fact about whether the statutory presumption applied in this case.

Joss attempts to overcome the lack of evidence by asserting that Campbell exercised undue influence over Johnson. "Undue" influence is influence that controls the testator's volition and prevents her from exercising her own judgment. Mueller v. Wells, 185 Wn.2d 1, 10, 367 P.3d 580 (2016). A party seeking to invalidate a will must prove by clear, cogent, and convincing evidence that the will is the product of undue influence. Id. The same principles apply in an

---

[2] Joss also relies on the statements of Claughton and Bainbridge, who both believed Johnson wanted the accounts to go to Joss. But neither Bainbridge nor Claughton allege first-hand knowledge of Johnson's intent. Their belief as to what Johnson wanted is not relevant or admissible under CR 56(e).

undue influence challenge to a JTWROS account. Doty v. Anderson, 17 Wn. App. 464, 468, 563 P.2d 1307 (1977). See also Kitsap Bank v. Denley, 177 Wn. App. 559, 312 P.3d 711 (2013) (undue influence challenge to P.O.D. designation).

The challenging party may raise a presumption of undue influence through evidence of suspicious facts and circumstances. Mueller, 185 Wn.2d at 10. The court considers several factors including (1) the existence of a fiduciary or confidential relationship, (2) participation in creating the testamentary instrument, and (3) an unnaturally large share of the estate. Id. at 10-11. The court must also consider the age, health, and mental vigor of the decedent; the nature and degree of relationship between the beneficiary and the decedent; the opportunity for exerting undue influence, and the naturalness or unnaturalness of the will. Id. at 10-11. While the first three factors are the most important, whether the facts create a presumption of undue influence depends on the totality of the circumstances. Id. at 11.

In Mueller, for example, the reviewing court affirmed the trial court's finding that a caretaker, Wells, exercised undue influence over an elderly woman, Barnes. Id. at 17. In that case, Wells isolated Barnes and encouraged her to mistrust her family; Barnes depended solely on Wells; Wells paid her own mortgage from Barnes's account while Barnes was incapacitated; Barnes was physically and mentally impaired; and Barnes was highly vulnerable to undue influence. Id. at 7-8.

Similarly, this court affirmed the trial court's finding of undue influence in Doty, 17 Wn. App. at 472. The Doty court held that a presumption of undue influence had been raised where Doty, the decedent, and Anderson, the beneficiary, had a close relationship; Anderson suggested a JTWROS account, helped Doty transfer money into the account, signed the bank forms, and withdrew substantial amounts during Doty's life; Anderson received an unusually large share of Doty's estate; Doty was mentally and physically impaired and consequently susceptible to undue influence; Doty entrusted her financial affairs to Anderson; and, in the last several months of her life, Anderson was the only person who aided Doty with her finances. Id. at 468-70.

In this case, Campbell and Joss both stated that Johnson was independent and managed her own affairs until her stroke in 2014. Johnson was not isolated and, according to Joss, Johnson saw Joss more frequently than she saw Campbell. Johnson first made Campbell JTWROS in 2010 when, according to Joss, Johnson was very independent and capable. Joss does not dispute that in 2012, she accompanied Johnson and Campbell to the bank or that it was Johnson's idea to go. Nor does she dispute that while there Johnson spoke with the banker privately. There is no evidence that Johnson sought Campbell's advice on financial matters or relied on her for assistance.[3] Campbell did not access the accounts until Johnson's final illness, when she used the funds to pay Johnson's bills. Campbell did not draw on the accounts for her own benefit until

---

[3] Joss makes the bald assertion that after Johnson's husband died, Campbell began helping her with financial decisions that her husband used to make. She fails to cite anything in the record to support the claim.

months after Johnson's death, when the bank told her the accounts belonged to her. The totality of the circumstances in this case do not raise a presumption of undue influence.

Joss argues, however, that Johnson was susceptible to undue influence due to her age, health, and vigor. She asserts that Johnson was already elderly and frail when she gave Campbell power of attorney in 2010. At oral argument, Joss asserted that Johnson was vulnerable or incompetent because she had been "institutionalized" at a rehabilitation facility.

The argument is without merit. Johnson's medical records from 2010 state that Johnson had a "waxing and waning of confusion."[4] CP at 33. But the same records describe Johnson as alert, competent to execute directives, and able to self-manage medications. Following ten days in the rehabilitation facility, Johnson continued to live independently. Joss and Campbell both described Johnson as independent and able to take care of herself until her final illness in 2014. Unlike Mueller and Doty, the record in this case does not establish that the decedent was susceptible to undue influence.

Joss also argues that Campbell and Johnson had a fiduciary and/or confidential relationship based on the 2010 power of attorney and Campbell's

---

[4] Campbell objects to the medical records as inadmissible under ER 403. She asserts that, in the absence of expert testimony, the medical records are confusing and unhelpful. We reject this argument. The medical records include some specialized vocabulary, but they largely consist of descriptions of the circumstances of each visit, Johnson's diagnosis, and notes about her care. The danger of confusion does not substantially outweigh the records' probative value.

13

role in providing Johnson transportation.[5] For purposes of undue influence, a fiduciary relationship exists where one party acts as an attorney for another in relation to the disputed asset. Kitsap Bank, 177 Wn. App. at 574. A confidential relationship is analogous but based on a personal, rather than professional, tie. Id. at 572. See also In re Estate of Palmer, 145 Wn. App. 249, 263, 187 P.3d 758 (2008) (fiduciary duty arises when the attorney in fact exercises dominion and control over the principal's property).

In this case, Joss points to no evidence that Campbell managed Johnson's finances or assisted Johnson with financial decisions. Campbell did not access Johnson's accounts or help Johnson pay bills until Johnson's final illness. And Joss points to no evidence that Campbell acted as a fiduciary or confidante in relation to the JTWROS designation. The factor does not support an inference of undue influence.

Joss also argues that the second factor, participation, raises a suspicion of undue influence. Participation may indicate undue influence where the beneficiary's participation causes or brings about the testamentary instrument. Mueller, 185 Wn.2d at 584. In Doty, for example, the beneficiary suggested a joint account, assisted the decedent in transferring her savings into the joint account, and signed the signature card. Doty, 17 Wn. App. at 468. She also withdrew substantial amounts during the decedent's life. Id. at 466.

---

[5] Joss contends that, because of this relationship, we should presume undue influence. We do not address this issue because Joss fails to establish the existence of a fiduciary and/or confidential relationship.

14

In this case, Joss asserts that Campbell instigated the 2012 JTWROS transaction in an effort to protect Johnson from Roger. Campbell also drove Johnson and Joss to the bank and signed the bank form. These circumstances, Joss argues, demonstrate that Campbell orchestrated the 2012 transaction.

We disagree. In her deposition, Campbell suggested that preventing Roger from getting checks may have been a reason for the 2012 transaction. Campbell stated, however, that the change was Johnson's idea and she did not know why Johnson added her to the account. It does not appear that Campbell suggested executing a new JTWROS form in 2012. But even if she did, the circumstances here are distinguishable from cases in which courts have found participation. In this case, Campbell was already JTWROS. Her status did not change in 2012. In addition, Campbell's statement indicates that she, Johnson, and Joss all discussed Roger then went to the bank, where Johnson spoke with a banker alone. There is no indication that Campbell instructed the banker as to Johnson's wishes.

Next, Joss contends Campbell received a benefit that was unnaturally large for a part-time caregiver and distant relation. Joss argues that leaving the bank accounts to Campbell is inconsistent with Johnson's conduct during her life, when she made only small gifts and reimbursements to Campbell.

We may measure the unusual or unnatural nature of a benefit in comparison to previous testamentary instruments and bequests to other beneficiaries. Mueller, 185 Wn.2d at 585. In this case, the bank accounts appear

to be a substantial portion of Johnson's estate.[6] But, because Johnson did not execute a will or discuss her estate plans, the record provides no indication of a previous contrary intent. The record is silent as to the degree to which Johnson valued Campbell, Joss, or any other relative. Considering the length of time Johnson knew Campbell, the services Campbell rendered, and the lack of reimbursement during Johnson's life, the benefit is not necessarily unnatural.

Viewing the record as a whole, we conclude that Joss failed to establish facts and circumstances sufficient to raise a presumption of undue influence. The trial court did not err in rejecting the claim.

Joss next contends the trial court erred because Campbell financially exploited a vulnerable adult and may not benefit from this exploitation. The Abuse of Vulnerable Adults Act, chapter 74.34 RCW, establishes protections for adults over age sixty who have "the functional, mental, or physical inability to care for himself or herself." RCW 74.34.020(22)(a). In part, the chapter protects against financial exploitation, including the use of undue influence to obtain funds from a vulnerable adult. RCW 74.34.020(7). Under the "slayer statute," a party who has financially exploited a vulnerable adult may not benefit from the death of that adult.[7] RCW 11.84.010(5), .020.

---

[6] Campbell asks that we not consider this argument because Joss failed to provide specific evidence of the estate's total value. We note, however, that the trial court observed that the accounts were from one-third to one half of the estate's total value.

[7] Campbell asserts that Joss lacks standing to bring this claim. Only the estate may bring a claim for damages under the Abuse of Vulnerable Adults Act. RCW 74.34.210. Joss's claim, however, is based on the slayer statute. Joss has standing to bring this claim under TEDRA, which grants standing to any party with an interest in an estate-related decision. RCW 11.96A.080(1); RCW 11.96A.030(5)(i).

Joss asserts that Johnson was a vulnerable adult, Campbell exploited her by becoming JTWROS through undue influence, and Campbell may not inherit under the slayer statute. But, as discussed above, Joss fails to show that Johnson was vulnerable or that Campbell exercised undue influence. She fails to establish a prima facie claim.

As a final theory, Joss argues that Campbell was unjustly enriched. She fails to show that the theory is applicable in the circumstances here. A plaintiff alleging unjust enrichment must establish that she conferred a benefit upon the defendant, the defendant knew of the benefit, and the defendant retained the benefit in circumstances that make the retention unjust. Young v. Young, 164 Wn.2d 477, 484, 191 P.3d 1258 (2008). Joss fails to establish that she conferred a benefit upon Campbell.

Lastly, Joss appeals the trial court's award of fees and costs to Campbell. The trial court found it equitable for Joss to pay a portion of Campbell's fees and costs. The court found that Joss initiated the action long after Johnson's death and, despite investigations by Bank of America and the sheriff's office, Joss failed to produce evidence as to key issues. Joss contends this was error.

We disagree. Superior and appellate courts have discretion to award reasonable attorney fees and costs to any party in a TEDRA action. RCW 11.96A.150(1). The trial court did not abuse its discretion in this case in awarding Campbell a portion of her fees and costs.

Joss and Campbell both ask for fees and costs on appeal. Because Joss's claims on appeal are meritless, we award fees to Campbell.

No. 76652-0-I/18

Affirmed.

WE CONCUR:

_Specimen, J._

_Leach, J._

_Schindler, J._

18