**FILED**
**JULY 18, 2019**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Involuntary Treatment of | ) ) ) | No. 36119-5-III |
| W.H. | ) ) ) ) | UNPUBLISHED OPINION |

SIDDOWAY, J. — W.H. appeals an order involuntarily committing him to 14 days intensive mental health treatment after he exhibited aggressive, manic behavior at a hospital emergency room. At the probable cause hearing the court commissioner found that W.H. was on the road to recovery but reasonably found that he was still suffering from a grave disability within the meaning of RCW 71.05.020(22)(b). For that reason, and because any error in failing to give a statutorily-required notice of loss of firearm rights early in the probable cause hearing was not preserved, we affirm.

No. 36119-5-III
*In re Involuntary Treatment of W.H.*


FACTS AND PROCEDURAL BACKGROUND

In May 2018, W.H., a resident of Indiana, was traveling with his father through Washington State when he lost his medications. Among them were psychiatric medications and pain medications for his back. Upon arriving in Spokane, he had been without his medications for several days and was suffering from headaches, nausea, and chills. He attributed the shivering and nausea to withdrawal from the opiates prescribed for his back pain.

Having decided that an urgent care clinic or emergency room might be able to contact his providers in Indiana and provide him with his prescribed opiates and benzodiazepine, W.H. walked from his hotel to Sacred Heart Hospital. According to him, the admitting nurse in the hospital emergency room kept him waiting for a couple of hours and, when he eventually asked if he could have a blanket because of his chills, told him no. Sacred Heart staff's version of his emergency room visit was that W.H. yelled, screamed, spit, and threw a urinal at staff, demanding that he be treated immediately. His behavior resulted in his being placed in restraints and a spit mask.

A hospital psych triage nurse requested that W.H. be evaluated by a crisis responder designated by the county, based on concerns that he was gravely disabled and a danger to others. The psych triage nurse passed along information that W.H. had been diagnosed with bipolar disorder, but W.H. disputed the diagnosis.

2

After evaluating W.H., the crisis responder prepared a petition for his initial detention, asserting that W.H. presented an imminent likelihood of serious harm to others and was in imminent danger because of being gravely disabled.

Two days later, a physician and a mental health professional on Sacred Heart staff filed a petition seeking to commit W.H. to 14 day intensive involuntary treatment. The petition stated that W.H.'s current diagnosis at Sacred Heart was bipolar disorder. The petition described W.H., following detention, as

> present[ing] with irritability, labile affect, grandiosity, agitation, threats to punch security, tangential thought process, loose associations, pressured and rambling speech, poor insight and poor judgment. [W.H.] is hostile and threatening with nursing staff, refuses assessments, continuously yells out over staff during assessments, and refuses as needed medications.

Sealed Clerk's Papers (SCP) at 15. The petition expressed the opinion of the examining physician and mental health professional that W.H. continued to present a likelihood of serious harm to others and was gravely disabled. It stated that W.H. had declined voluntary treatment.

At the probable cause hearing on the petition, the hospital's witness was Dr. Rachel Wix, a court evaluator and staff psychologist for Frontier Behavioral Health. Dr. Wix testified that in preparing for her testimony, she met with W.H., reviewed W.H.'s chart at Sacred Heart, spoke with the treating psychiatrists, and reviewed medical records of some of W.H.'s care in Indiana.

Dr. Wix testified that W.H. suffers from bipolar disorder, for which he was currently prescribed Risperidone, Depakote, Latuda, Valium, Lamictal, and Gabapentin. She testified that he had previously been hospitalized in Indiana in 2014 under circumstances similar to his detention at Sacred Heart: he had reported to the hospital after he stopped taking his medications.

Dr. Wix testified that when W.H. came to Sacred Heart, he was experiencing a manic episode. She said he had remained agitated, labile, and unpredictable during the period of his detention. She testified that he had not been medication compliant when he first arrived at the hospital, so forced medication was ordered if he refused. He then acceded to taking medication and by the time of the hearing was medication compliant. But she characterized him as regularly "argumentative around taking his medication," saying that he "often tries to negotiate and bargain when given medications." Sealed Report of Proceedings (SRP) at 17.

Dr. Wix said that W.H. had made minimal improvement since being admitted. He had gone from sleeping only 45 minutes a night when first detained to sleeping 3 and a half hours the night before the hearing. Dr. Wix said she nonetheless had concerns about W.H. if he was released into the community, stating he had no family or resources to help him in Spokane, and because "he doesn't believe that he has bipolar disorder or needs medications to treat that disorder, I have no faith that he would follow through with mental health follow up in the community." SRP at 19. She observed that the fact that

4

he disputed the diagnosis of a psychiatrist who had treated him for 14 years demonstrated his poor insight into his mental health needs. She testified she was also concerned that because W.H. was so easily agitated and had threatened hospital staff, he was a serious risk of harm to others. At the time of the hearing, W.H. had been released from restraints but was still being held in seclusion.

Asked about the treatment plan for W.H., Dr. Wix testified that it was to get his symptoms stabilized and discharge him appropriately.

Following Dr. Wix's testimony, W.H. testified on his own behalf. Because of W.H.'s prior behavior, three Sacred Heart security employees were present at the hearing and the court commissioner strongly cautioned W.H. at the outset that if he lost control or was disruptive he would be removed, and the hearing would continue without him. W.H. stated that he understood, and the transcript reveals that he was in control, responsive and respectful throughout the hearing.

W.H. recounted his reasons for going to Sacred Heart and said of the admitting nurse that he "gave her time" but "[s]till [got] nothing from her," characterizing the nurse as "chitchatting with the security guards and one of her technicians" when she refused his request for a blanket. SRP at 31. He conceded that his psychiatrist from Indiana believes he has bipolar disorder, but testified, "[W]e've been discussing that. There's nothing in

5

the DSM 5[1] that indicates that I do have bipolar." *Id.* In W.H.'s view, he has experienced depression from growing up in a dysfunctional family and has "a very, very low tolerance for being disrespected." *Id.* Despite admitting that he "get[s] easily offended," he said he had an "absolutely clean record" and had not assaulted anyone since high school. SRP at 32.

W.H. testified that if released, his father would pick him up, "no problem whatsoever." SRP at 33. He testified that following release, "I'll call my doctor, have him get me my regular medications, and I'll stay on those until we have an opportunity to discuss whether they're needed, and I'll work closely with him." SRP at 34. Asked by the court commissioner how he supports himself, W.H. said that he receives a total of about $4,400 a month in Social Security and rental property income.

The commissioner orally ruled at the conclusion of the hearing, stating that no risk of harm to others had been proved, nor had the petitioners "spent much energy" trying to prove that W.H. was gravely disabled within the meaning of RCW 71.05.020(22)(a). SRP at 46. As to the definition of "gravely disabled" provided by RCW 71.05.020(22)(b), however, the commissioner stated,

> [W]hat's troubling is that [W.H.] seems to resist the idea of being diagnosed with bipolar disorder. And, frankly, this is somewhat remarkable in light of the fact that, after a many-year relationship with a

---

[1] DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (5th ed. 2013).

> board certified psychiatrist who disagrees with him, [W.H.] persists. And this may be an obstacle to his effective treatment.
> We see an incident very similar to his current situation back in 2014 where he presented at a hospital in Indiana, similar symptoms, you know, very agitated, delusional, having a manic episode.

SRP at 46. Although acknowledging that W.H. seemed to be responding to treatment, the commissioner stated that on arriving at the hospital, W.H. had refused to take psychiatric medications, indicating a lack of insight into his mental health needs. He also observed that W.H. had been a difficult patient to manage, "all of which is somewhat different from how he presents today." SRP at 47. The commissioner concluded:

> The Court would find that [W.H.]'s apparently on the road to recovery. He's getting stabilized, may not be quite there today. I think there would be a risk, if the petition were dismissed, that he would not be able to obtain necessary treatment in a timely fashion, particularly given that his doctor is in Indiana. He's kind of in a transient status here in Spokane. It's a little unclear, you know, what—what would happen, and the Court would find that grave disability exists under part [(b)] of the statute, to detain him for further stabilization so that a plan can be worked out for his kind of smooth and safe transition back into the community.

*Id.* The commissioner added that if W.H.'s medications were working and he was sufficiently stable, he could be released within a matter of days.

At the conclusion of his ruling, the commissioner stated that W.H. "should also understand that, with the entry of the order today, that his right to possess firearms will be suspended." SRP at 48. Written findings and conclusions were presented and entered after the commissioner closed the record of the hearing.

No. 36119-5-III
*In re Involuntary Treatment of W.H.*

Nine days later, the civil commitment order was dismissed on a joint motion of the parties. W.H. appeals.

## ANALYSIS

W.H. makes two assignments of error: he contends first, that the commissioner failed to provide a statutorily-required notice of the risk of a loss of his firearm rights, and second, that insufficient evidence supports the finding that he was gravely disabled within the meaning of RCW 71.05.020(22)(b). We address the issues in the order stated.[2]

I.      ERROR, IF ANY, IN FAILING TO PROVIDE THE NOTICE REQUIRED BY RCW 71.05.240(2) WAS NOT PRESERVED

A person who is involuntarily committed for mental health treatment for 14 days under RCW 71.05.240 may not possess a firearm unless his or her right to do so is restored. RCW 9.41.040(2)(a)(iv), .047. Because an individual's agreement to *voluntary* treatment will avoid the loss of firearm rights, RCW 71.05.240(2) provides that if a petition for a 14 day civil commitment is for mental health treatment,

> the court at the time of the probable cause hearing and before an order of commitment is entered shall inform the person both orally and in writing that the failure to make a good faith effort to seek voluntary treatment as

---

[2] The State's response presents a threshold argument that the appeal is moot in light of the dismissal of the commitment order and W.H.'s release. "An individual's release from detention does not render an appeal moot where collateral consequences flow from the determination authorizing such detention," however. *In re Det. of M.K.*, 168 Wn. App. 621, 626, 279 P.3d 897 (2012). Under RCW 71.05.012, .212, and .245, "each order of commitment entered up to three years before the current commitment hearing becomes a part of the evidence against a person seeking denial of a petition for commitment." *M.K.*, 168 Wn. App. at 626.

8

provided in RCW 71.05.230[3] will result in the loss of his or her firearm rights if the person is subsequently detained for involuntary treatment under this section.

W.H. argues that it was only at the conclusion of his probable cause hearing— after the commissioner had orally granted the petition—that the commissioner informed him of his loss of firearm rights. He argues that the failure of the commissioner to provide earlier notice requires that the commitment order be reversed. In the proceeding below, no objection was made to the commissioner's failure to provide the notice at an earlier time.

RAP 2.5(a) states the general rule that appellate courts will not entertain issues not raised in the trial court. *State v. Guzman Nunez*, 160 Wn. App. 150, 157, 248 P.3d 103 (2011) (citing *State v. Scott*, 110 Wn.2d 682, 685, 757 P.2d 492 (1988)), *aff'd*, 174 Wn.2d 707, 285 P.3d 21 (2012). The reason for the rule is to afford the trial court an opportunity to correct errors as they are raised, thereby preserving the use of judicial resources. *Scott*, 110 Wn.2d at 685.

An exception applies where the claimed error is "manifest error affecting a constitutional right." RAP 2.5(a)(3). To establish manifest constitutional error, a criminal defendant must identify a constitutional error and additionally show that the

---

[3] RCW 71.05.230(2) provides that before a petition for such a commitment may be filed, the person must be advised of the need for voluntary treatment and given an opportunity to volunteer.

error negatively affected his rights at trial. *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). "It is this showing of actual prejudice that makes the error 'manifest,' allowing appellate review." *Id*. at 927 (citing *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995)).

The error assigned by W.H. is not constitutional error. Traditionally, individuals who were mentally ill were considered dangerous to the public and to themselves, and for that reason were held to be outside the scope of protection by the Second Amendment to the United States Constitution. *E.g.*, *Beers v. Att'y Gen. U.S.*, 927 F.3d 150, 2019 WL 2529248, at *5 (3d Cir. June 2019) (upholding federal law prohibiting the possession of firearms by anyone previously adjudicated as mentally ill). The right to bear arms conferred by article 1, section 24 of the Washington Constitution is likewise subject to reasonable limitation by the legislature, including when an individual has been involuntarily committed for mental health treatment. *Morris v. Blaker*, 118 Wn.2d 133, 145, 821 P.2d 482 (1992). At issue is not the constitutional issue of whether W.H. can be forbidden to possess a firearm, but the commissioner's alleged violation of a statutory duty to provide notice at an earlier time.

It is not clear that the statute was violated. The record suggests that while the commissioner provided the required oral and written notice after orally ruling, it was provided before the order of commitment was signed. *See* SRP at 48; SCP at 66.

10

Assuming the statute requires earlier notice, W.H.'s lawyer could have objected before entry of the order of commitment. The error, if any occurred, was waived.

II.    SUBSTANTIAL EVIDENCE SUPPORTS THE COMMISSIONER'S FINDING THAT W.H.
       WAS GRAVELY DISABLED WITHIN THE MEANING OF RCW 71.05.020(22)(b)

Under chapter 71.05 RCW, persons may be involuntarily committed for treatment of mental disorders if, as a result of such disorders, they either (1) pose a substantial risk of harm to themselves, others, or the property of others, or (2) are gravely disabled. *In re Det. of LaBelle*, 107 Wn.2d 196, 201-02, 728 P.2d 138 (1986) (citing former RCW 71.05.020(1), .020(3), .150, .240, .280, .320 (1986)). RCW 71.05.020(22) provides a twofold definition of "gravely disabled" as meaning

> a condition in which a person, as a result of a mental disorder: (a) Is in danger of serious physical harm resulting from a failure to provide for his [or her] essential human needs of health or safety, or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or her actions and is not receiving such care as is essential for his or her health or safety.

*LaBelle*, 107 Wn.2d at 202 (footnote omitted) (quoting former RCW 71.05.020(17) (LAWS OF 2016, ch. 255, § 1)). Either alternative may serve as the basis for involuntary commitment. *Id.*

When the State proceeds under RCW 71.05.020(22)(b), the basis for W.H.'s commitment,

> it is particularly important that the evidence provide a factual basis for concluding that an individual "manifests severe [mental] deterioration in routine functioning". Such evidence must include recent proof of

11

>significant loss of cognitive or volitional control. In addition, the evidence
>must reveal a factual basis for concluding that the individual is not
>receiving or would not receive, if released, such care as is essential for his
>or her health or safety. It is not enough to show that care and treatment of
>an individual's mental illness would be preferred or beneficial or even in
>his best interests.

*LaBelle*, 107 Wn.2d at 208 (alteration in original).

Because a 14 day commitment is at issue, the burden of proof is by a preponderance of the evidence. RCW 71.05.240(3)(a). "Preponderance of the evidence means that considering all the evidence, the proposition asserted must be more probably true than not true." *State v. Otis*, 151 Wn. App. 572, 578, 213 P.3d 613 (2009). "[W]here the trial court has weighed the evidence, appellate review is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." *LaBelle*, 107 Wn.2d at 209. We defer to the trial court's determination of the weight of the evidence and credibility of witnesses. *In re Estate of Barnes*, 185 Wn.2d 1, 16, 367 P.3d 580 (2016).

The State relied in this case on the testimony of Dr. Wix, a licensed psychologist, who expressed her opinion that W.H. was gravely disabled and explained the reasons for her opinion. Her testimony was based on almost an hour spent with W.H. in the prior week, a review of the medical charting prepared during the period of his detention, and

review of medical records of some of his care in Indiana, including his 2014 hospitalization. She had also spoken with his treating psychiatric providers twice.

There was substantial evidence that W.H. suffers from bipolar disorder and undisputed evidence that he had quit taking his medication for the disorder for several days before presenting at Sacred Heart. There was substantial evidence that he had exhibited agitated, aggressive, manic behavior during the week preceding the hearing, to the point of being in restraints for a time and in seclusion thereafter. The evidence established that he was only begrudgingly medication compliant. Among the most concerning evidence was that he did not accept the diagnosis that he suffered from bipolar disorder and did not believe he needed the medication prescribed to treat it.

The evidence that he had been previously hospitalized in Indiana in 2014 after he stopped taking his bipolar medications foreclosed the possibility that this was an isolated crisis attributable to his losing his medication.

Dr. Wix testified that W.H. had made only minimal improvement during his detention, continued to be easily agitated, and his emotions continued to swing wildly. She said that in a single conversation with her, W.H. ranged from being calm and cooperative, to tearful and emotional, to being so angry that his face and torso were red, fists clenched, and he had to speak through clenched teeth. She expressed strong concern that if released into the community, W.H. would not follow through with care essential to his health and safety.

No. 36119-5-III
*In re Involuntary Treatment of W.H.*

Under a preponderance of evidence standard, this evidence supported the commissioner's finding that W.H. was gravely disabled within the meaning of RCW 71.05.020(22)(b).

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

I CONCUR:

_____
Fearing, J.

I CONCUR IN RESULT ONLY:

_____
Lawrence-Berrey, C.J.

14