IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Detention of R.L.W., | ) | No. 81292-1-I |
| | ) | |
| STATE OF WASHINGTON, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | UNPUBLISHED OPINION |
| | ) | |
| v. | ) | |
| | ) | |
| R.L.W., | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

HAZELRIGG, J. — R.L.W. seeks reversal of an order of commitment that allowed him to be involuntarily held at the Seattle Veteran's Administration Hospital for 14 days of treatment. He contends that the superior court erred in finding that he would present a likelihood of serious harm to others if released and in concluding that a less restrictive alternative (LRA) to commitment was not warranted when all of the testifying experts recommended an LRA. Because substantial evidence supports the court's findings of fact and the court complied with the statutory requirements when diverging from the treatment plan endorsed by the expert witnesses, we affirm.

Citations and pinpoint citations are based on the Westlaw online version of the cited material.

FACTS

R.L.W. is a 71-year-old Vietnam veteran who lives in Pacific, Washington. He suffers from post-traumatic stress disorder (PTSD) and pancreatic cancer. On February 20, 2020, a King County Designated Crisis Responder, Tammy Morrill, filed a petition for a 72-hour detention of R.L.W. The petition alleged that R.L.W. was admitted to the Seattle Veteran's Administration Hospital (VA) for abdominal pain two days before but "left against medical advice when he realized he would have to surrender his THC."[1] R.L.W. "spent the night in the hospital public areas with permission of the police without incident."

The petition alleged that R.L.W. was directed to the emergency department after making suicidal statements. He became angry and attempted to leave after again being asked to surrender his belongings. A medical doctor determined that it was not safe for R.L.W. to leave, so he was physically restrained by VA Federal Officers. The petition stated that "[i]n the course of this restraint, an officer was struck, [R.L.W.] had to be pepper sprayed and he was taken to the ground." In the emergency room, R.L.W. was "medically cleared but required physical and multiple doses of chemical restraint" as he continued to threaten hospital staff, their families, and self-harm. The petition alleged that R.L.W. required involuntary psychiatric hospitalization because he had no crisis plain in place and was "an imminent danger to himself and others and gravely disabled."

The same day, the VA filed a petition for 14-day involuntary treatment of R.L.W. The petition alleged that R.L.W. presented a likelihood of serious harm to

---

[1] Tetrahydrocannabinol.

himself and others and was gravely disabled as a result of his mental disorder. It also stated that R.L.W. had refused voluntary treatment and that "there are no less restrictive alternatives to detention in the best interest of the respondent or others because safety concerns require care on an inpatient psychiatric unit."

A hearing on the petition began on March 2, 2020. At the hearing, the State chose to proceed only on the risk of harm to others allegation. It did not dispute R.L.W.'s counsel's assertion that the VA was seeking a less restrictive alternative (LRA) to commitment instead of involuntary inpatient treatment. The court heard testimony from three VA emergency room nurses who interacted with R.L.W., the VA psychiatrist and VA licensed clinical social worker who evaluated R.L.W., the defense expert psychologist, and R.L.W. himself.

VA nurse Anne Fanslow testified that she met R.L.W. in the triage room and escorted him to a psychiatric emergency services room to explain the process to facilitate his care. R.L.W. "became pretty immediately combative" and did not want to cooperate. Fanslow was uncomfortable and called a VA social worker into the room. R.L.W. said he was going to "take all of his morphine out of his bag and take them at one time," so Fanslow took his bag and handed it to the social worker, who left the room. R.L.W. followed, took his bag back from the social worker, and started leaving the hospital. Fanslow called a "code green," which activates "a mass response to a patient who's disruptive . . . [a]nd unsafe." Campus police moved to detain R.L.W., and when an officer grabbed his wrist, he punched the officer. Police took him to the ground, pepper sprayed him, and handcuffed him. R.L.W. was taken back to the psychiatric emergency services room on a gurney

while threatening to kill nursing staff and police. Fanslow recalled that he continued to make threats on the several other occasions that she encountered him during his stay.

Jacqueline Zawyrucha, another VA nurse, testified that she first encountered R.L.W. when he was on the ground being handcuffed by police and she approached to help get him onto a gurney. R.L.W. was in pain, not willing to stand up, and wanted his hands released so that he could wipe his eyes. When Zawyrucha explained to him that "we needed to do our job and get him on to the gurney . . . and make sure that we were all safe," R.L.W. started swearing and threatening to "kill you all." A few hours later, when Zawyrucha went to fix his IV,[2] R.L.W. remained uncooperative and belligerent, moving his hands as if to test the restraints on his arms. He told her that he had a gun and stated, "I would never use it on myself, but you're another story." Zawyrucha also recalled that R.L.W. asked her to bring a police officer back to his room so that he could "put my thumb in his eye, and . . . they'll have nothing better to do than to kill me." He was not showing any signs of confusion and seemed aware and oriented.

James Hetherington testified that he was the primary nurse assigned to R.L.W. on February 19, 2020. When Hetherington first saw R.L.W. that day, he was on a gurney and attempting to get the pepper spray out of his eyes. R.L.W. was uncooperative during his treatment and made threatening statements implying that he was going to come to Hetherington's house and harm his family and return to the VA to kill staff.

---

[2] Intravenous line.

Dr. Timothy Bondurant, a VA psychiatrist, evaluated R.L.W. while he was being held at the hospital and opined that he has PTSD, antisocial personality disorder, and an opiate use disorder. He described R.L.W. as "antagonistic for many of the first several days" that he was in the hospital and recounted R.L.W.'s statements that he wanted to come back and hurt emergency department staff. Bondurant concluded that R.L.W. presented a risk of serious harm to others "in the long term," especially given his reports of ready access to firearms. When asked what treatment setting he felt was appropriate for R.L.W., Bondurant responded:

> Well, ideally outpatient therapy would be best. I think at this point, honestly, I think [R.L.W.] isn't being served to the best of care that he could be being on the inpatient ward. In part that's because he's not really participating all that much.
> I think there is at this point an antagonistic relationship with the VA. He feels—and he said this almost every day—that he didn't want to come back for care.

Bondurant also noted that the VA had placed a "behavioral flag" on R.L.W. that required him to check in with VA police every time he came to the hospital campus, which contributed to his animosity toward the VA. R.L.W. had requested community care, and his "outpatient psychiatrist" had come to the VA to meet with R.L.W. and was willing to do weekly telephone appointments with R.L.W. until his community care was arranged. Bondurant noted that R.L.W.'s "risk for [homicidal ideation] right now is low" but was concerned that "if he were released, not on an [LRA], that that risk would go up."

Licensed clinical social worker Rebekah Clinger-Prince testified that she had also evaluated R.L.W. at the VA and agreed with Bondurant's diagnoses. She also agreed that R.L.W. posed a risk of harm to others because of his disorders.

Clinger-Prince noted that he had "demonstrated a poor understanding of his needs for treatment" and an "unwillingness to engage in treatment on his own." She opined that R.L.W. would do best with "individualized psychotherapy" but understood that he preferred not to go to the VA, so she felt that an LRA was appropriate to "connect him to treatment and make sure that he [is] getting the care that he needs."

R.L.W. called Dr. Michael Stanfill, a licensed psychologist, who testified that he had evaluated R.L.W. on February 27, 2020 and reviewed the medical records from the VA. Stanfill agreed with the PTSD diagnosis but did not find any additional psychiatric diagnoses. He opined that R.L.W. did not present a substantial risk of physical harm to others. He testified that he did not think hospitalization or an LRA was appropriate for R.L.W. because he had been living with and managing his PTSD for 50 years.

Finally, R.L.W. testified that he was hungry and dehydrated when he arrived at the VA and became verbally belligerent only after he was pepper sprayed. He did not remember what he said but felt he was fighting back to protect himself in the only way he could. He stated that he had trouble staying on the medications that manage his PTSD because of his increasing weakness from cancer. He had been taking his medications regularly while he was in the hospital and intended to try to continue taking them after he was discharged. R.L.W. stated that his firearms were stored at a friend's house in Oregon and he did not intend to purchase more.

The court found by a preponderance of the evidence that R.L.W. presented a likelihood of serious harm to others as a result of a mental disorder. Despite the

fact that no expert testified that involuntary commitment was warranted, the trial court also found that an LRA was not in the best interest of R.L.W. or others. It did not feel that an LRA was appropriate because R.L.W. was not yet stabilized and was not engaging in all necessary and recommended treatment. The court also noted that it "did not find that the VA's less restrictive order proposal was adequate as the provider would only meet with the patient via phone, no appointments were presented, and it was unclear if [the provider] understands the terms of a less restrictive order or what it entails." The court concluded that R.L.W. should be involuntarily held at the VA hospital for 14 days of treatment. He was released from the care of the VA hospital on March 10, 2020. R.L.W. appealed.

ANALYSIS

R.L.W. argues that the 14-day involuntary commitment order should be reversed because neither party requested inpatient treatment, no expert favored inpatient treatment, and the evidence presented at trial was insufficient to support the order.[3] The State argues in response that it provided sufficient evidence to prove that R.L.W.'s mental illness caused a likelihood of serious harm to others and that the trial court complied with the statutory requirements when deciding not to follow the recommendations of the expert witnesses.

_____

[3] Although the order of commitment at issue in this appeal has expired, R.L.W. argues that the case is not moot because we may provide him effective relief from any future adverse consequences resulting from the order and its supporting factual findings. The State also requests that we decide this case on the merits. Because our decision could still provide R.L.W. with effective relief from collateral consequences flowing from the determination authorizing his detention, we will consider the merits of his appeal. See In re Det. of M.K., 168 Wn. App. 621, 626, 279 P.3d 897 (2012).

An individual may be involuntarily committed for mental health treatment if, as a result of a mental disorder, they either (1) pose a substantial risk of harm to themselves, others, or the property of others, or (2) are gravely disabled. RCW 71.05.240(4)(a); In re Det. of LaBelle, 107 Wn.2d 196, 202, 728 P.2d 138 (1986). A "substantial risk" must be shown by a "recent overt act" that has caused harm or created a reasonable apprehension of dangerousness. In re Det. of Harris, 98 Wn.2d 276, 284–85, 654 P.2d 109 (1982). The trial court must also consider whether the individual and the community would be better served by an LRA to involuntary detention and treatment. RCW 71.05.240(4)(a). If the court finds by a preponderance of the evidence that the person meets the criteria for involuntary commitment and determines that an LRA is not in the best interest of the person or others, the court shall order the person detained for treatment. Id.

When reviewing an involuntary commitment order, we consider whether the trial court's findings of fact are supported by substantial evidence and whether those findings support the court's conclusions of law. In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998). Evidence is substantial when it is sufficient to persuade a fair-minded, rational person of the finding's truth. Id. "We defer to the trial court's determinations of the weight and credibility of the evidence." Mueller v. Wells, 185 Wn.2d 1, 9, 367 P.3d 580 (2016).

R.L.W. concedes that there was sufficient evidence to find that he had a mental disorder but disputes the finding that he posed a risk of harm to others because there was "no evidence of [R.L.W.] recently acting belligerent and threatening to others outside the context of the VA." He argues that, because any

- 8 -

"potential for harm was limited to VA staff," the finding that he would present a likelihood of serious harm to others if he left the hospital was not supported by substantial evidence: "There was substantial evidence that [R.L.W.] posed a potential threat of harm to VA staff, but only when he is in the hospital either not getting the care he demands or being forced to receive care he does not want."

Here, there was sufficient evidence from which a reasonable finder of fact could conclude that R.L.W. posed a substantial risk of harm to others if he were to leave the hospital. The court heard testimony that R.L.W. had committed the recent overt acts of physically assaulting a police officer and making threats of violence to VA staff that they reasonably considered credible. The court specifically stated that it found Fanslow, Zawyrucha, and Hetherington to be credible witnesses, a determination that we cannot review. R.L.W.'s threats included warnings that he would "come back" to the hospital to harm staff or go to staff member's houses to hurt them and their families, showing that the risk was not limited to the period in which R.L.W. was being held in the hospital. As the State points out, it was not required to prove that R.L.W. was "a threat to the general public as opposed to a specific person or group of people."

R.L.W. also challenges the court's finding that an LRA was not appropriate. The State argues that the trial court complied with the strictures of RCW 71.05.237 when deciding not to follow the recommendations of the expert witnesses supporting an LRA. Although no testifying expert recommended inpatient treatment rather than an LRA, courts are not required to follow expert witnesses' recommendations. RCW 71.05.237. When the court chooses not to follow an

expert's recommendation, "the court shall enter findings that state with particularity its reasoning, including a finding whether the state met its burden of proof in showing whether the person presents a likelihood of serious harm." Id.

The court entered written findings that R.L.W. presented a likelihood of serious harm to others and that an LRA was inappropriate because R.L.W. was not yet stabilized or engaging in all necessary and recommended treatment. Bondurant testified that R.L.W.'s risk for homicidal ideation could increase if he were released and that R.L.W. was "not really participating" in his treatment. Although Bondurant made these statements in the context of recommending an LRA, they provide substantial evidence for the court's findings that R.L.W. was not stabilized or engaging appropriately in treatment.

The court also stated that the LRA proposal was insufficient to address R.L.W.'s needs because the information provided to the court did not specify appointment dates and times or indicate that the non-VA provider, who had not testified, understood the terms of the proposal. R.L.W. contends that this shows that the court put the burden on him, rather than the State, to show that an LRA was appropriate. However, as R.L.W. stresses, the State proposed the LRA and was not seeking inpatient treatment. The court's finding that "the VA's less restrictive order proposal" was inadequate does not evidence improper burden-shifting; the court concluded that the State met its burden to prove that R.L.W. presented a risk of harm to others but did not meet its burden to show that its proposed LRA was appropriate.

Affirmed.

WE CONCUR: