**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| CHERYL STALEY and TERRY STALEY, a married couple, | No. 55951-0-II |
| Appellants, | |
| v. | |
| LYNNETTE HOFFMAN; THOMAS HOFFMAN; LISA COLLINS; PAUL COLLINS; ALFRED HOFFMAN; DIANA HOFFMAN and her ESTATE; and ANY OTHER INDIVIDUAL RESIDING ON THE PROPERTY OR CLAIMING BY, UNDER OR THROUGH ANY OF THEM, | UNPUBLISHED OPINION |
| Respondents. | |

PRICE, J.— Cheryl and Terry Staley appeal the trial court's order dismissing their claim for quiet title and granting Alfred and Diana Hoffman's counterclaim for quiet title. The Staleys argue that they proved all elements of adverse possession when their predecessors allegedly possessed the disputed property. Alternatively, the Staleys argue that they have a prescriptive easement over the disputed property. Finally, they argue the trial court's grant of attorney fees to the Hoffmans should be reversed. We conclude the Staleys did not prove their predecessors met the ten-year requirement for either adverse possession or a prescriptive easement. We also conclude the trial court did not err in awarding attorney fees to the Hoffmans. We affirm the trial court and grant the Hoffmans attorney fees for this appeal.

FACTS

I. BACKGROUND

Terry and Cheryl Staley purchased a parcel of property on Winlock-Vader Road in Lewis County (south parcel) in 2014.[1]  The south parcel is bordered on the west by Winlock-Vader Road and on the south and east by the Olequa Creek.  Due to a curve in the Olequa Creek, the south parcel narrows between the western portion of the south parcel where the Staleys' house sits, and a field (back field) that comprises the eastern portion of the south parcel.

The parcel of property (north parcel) directly north of the south parcel is owned by the Hoffman family: Alfred Hoffman, his children Lynnette Hoffman and Lisa Collins, and his children's respective spouses, Thomas Hoffman and Paul Collins.  The north parcel is also bordered on the west by Winlock-Vader Road and on the east by the Olequa Creek.

At the time the Staleys purchased the south parcel, a fence that was originally built in 1962 (the 1962 fence) existed just north of the property line between the north and south parcels.  The Staleys believed this fence represented the property line and used the property south of the fence but north of the property line (disputed property) to access their back field.  In 2019, the Staleys began allowing, and charging, campers to use the disputed property to access the back field where campsites were located.  The campers' use of the disputed property to access the back field caused a dispute between the Hoffmans and the Staleys as described below.

---

[1] Because many parties in this case have the same last names, we refer to most of the parties by their first names for clarity.  We intend no disrespect.

II. INCITING INCIDENT

When the Staleys purchased the south parcel in 2014, the 1962 fence had not been maintained and was not continuous. The Staleys' title report explicitly stated that a fence existed that did not conform to the property line. The Staleys did not review county records or otherwise research the property before purchasing the south parcel.

A poorly defined path (upper road) existed from the Staleys' driveway to their back field, crossing over the disputed property. The Staleys used the upper road for vehicle access to the back field.

In 2016, the Collinses commissioned a survey of the north parcel, and stakes were erected on the property line. Members of the Staley family knocked some of the stakes over, and the Staleys continued to use the upper road.

When the Staleys opened campsites in their back field near the creek in 2019, campers also began using the upper road to access the campsites. Lynnette Hoffman approached Terry Staley and asked that the campers stop using the upper road. Terry responded that the Staleys had a right-of-way across the disputed property to access the back field.

Lynnette requested proof of the right-of-way through text messages with Cheryl Staley. Cheryl replied with dates for alleged easements, including one for a neighbor's drain field, but none of the easements referenced by Cheryl affected the north parcel or described land that fell within the north parcel.

Lynnette ordered a title report, which concluded that the Staleys did not have a documented right-of-way over the disputed property. On July 29, 2019, Lynette sent a letter demanding that the Staleys stop allowing campers to use the upper road on the disputed property.

The Staleys responded a few weeks later, demanding that the Hoffmans cease and desist from building a fence on the surveyed property line and cede the disputed property to the Staleys. The Staleys claimed they owned the disputed property. Not only did the Staleys continue to use the upper road, they also graveled it.

The Staleys filed a lawsuit to quiet title to the disputed property to them, or alternatively, grant them a prescriptive easement to use the disputed property. The Hoffmans filed a counterclaim to quiet title to them. As part of their counterclaim, the Hoffmans alleged the Staleys had improperly widened their driveway so that it now encroached on the property line.

The case proceeded to a bench trial.

III. TRIAL

At trial, the Staleys argued that their predecessors adversely possessed the disputed property. The Staleys asserted that this period of adverse possession began either when an old fence was built by their predecessor, Jacob Orni, or later when the 1962 fence was built. The Staleys also asserted that utility easements granted by their predecessors show adverse possession and their driveway's encroachment on the property line shows adverse possession.

The Hoffmans argued that the Staleys did not show all the elements for adverse possession. The Hoffmans also asserted that there was no evidence of any historical use of the upper road for a sufficient duration to create a prescriptive easement.

Multiple witnesses testified about the use over time of the disputed property. Eileen Wideman, the granddaughter of the Staleys' predecessor, Jacob Orni, testified. Wideman grew up on the south parcel, and there was a fence (the old fence) between the properties when she was growing up in the 1940s and 1950s. The old fence was straight and started at Winlock-Vader

Road, going back to the Olequa Creek. She characterized the fence as "older" and described a gate in the fence. Verbatim Report of Proceedings (VRP) at 122. The fence was used to keep farm animals on the north parcel by the Hoffmans' predecessors, the Turulas. Wideman explained that Orni gave the Turulas permission to enter the south parcel and cross over the creek from the south parcel.

Archie Curtis, a neighbor of the Turulas, also testified. Curtis explained that when he lived near the Turulas and the Staleys' other predecessors, the Jacobys, there was a fence between the properties. The fence he remembers was straight, starting at Winlock-Vader Road and continuing down to the Olequa Creek. Curtis left to join the Marine Corps in May or June of 1962. When he left, the old fence was still in place.

John Jacoby (Jacoby), the son of John Jacoby Sr. and Doris Jacoby, also testified. Jacoby testified that his parents purchased the south parcel from the Orni family, and he grew up on the south parcel. Jacoby testified that his father wanted to begin raising cattle on the south parcel, so his father and Arvil Turula built a new fence (the 1962 fence) to replace the old fence. Jacoby thought the fence was built in 1961 or 1962, when he was a child. Jacoby and his father helped Turula build the 1962 fence, but Turula built most of the fence. Jacoby estimated that he helped build the fence for four to five days. After it was built, Jacoby helped maintain the fence.

Jacoby testified that he did not know of an agreement between his parents and the Turulas that the fence represented the property line. However, Jacoby believed the fence was the property line because Turula "was a well-respected man" and Jacoby "[didn't] think he'd be putting a fence other than where it should have been." VRP at 58. After Jacoby's father passed away, his mother, Doris, married Ken Robinette. Jacoby and his family would use a lower road along the bed of the

5

Olequa Creek to access the back field of the south parcel. The Jacobys and Robinettes did not access the field any other way.

Alfred Hoffman testified that he bought the north parcel from the Turulas in 1972.[2] When the Hoffmans purchased the north parcel, several cattle fences existed on the property, including the 1962 fence located roughly between the north and south parcels. Alfred had the north parcel surveyed when he and his wife, Diana, purchased it. Alfred knew that the 1962 fence was not the property line, and testified that the south parcel owners, the Robinettes, knew that the 1962 fence was not the property line. Alfred removed weeds and mowed south of the 1962 fence, and would pick plums from the trees south of the fence. Alfred gave the Robinettes permission to mow around their driveway on the disputed property. Both Alfred and his son-in-law, Paul, had the fields on the north parcel hayed.

Alfred and Diana Hoffman raised cattle on the north parcel until around 1985-1987. Prior to that point, Alfred only maintained the fences on the north parcel, including the 1962 fence, to keep his cattle on his property. He never moved the 1962 fence to the actual property line because "[t]here was no sense in moving [the fence] when it was still working" and it would have been "a lot of work." Clerk's Papers (CP) at 492, 497.

Sara Hancock testified for the Staleys. Sara is Jacoby's daughter and granddaughter of Doris Robinette. Sara spent time at the south parcel during summers and holidays while growing up. Sara and her husband purchased the south parcel from Doris in 2007. Her family created a path from the south parcel front yard, over the disputed property, and to the back field by riding

---

[2] Due to Alfred Hoffman's health, the parties and the court allowed his testimony via a deposition to be considered at trial.

dirt bikes.[3] They mowed the path a few times, but the path was mostly formed by riding dirt bikes. A dispute about the property line began between the Hancocks and the Hoffmans when Paul Collins (Alfred Hoffman's son-in-law) began removing fence posts from the 1962 fence. However, in 2011, before the dispute was resolved, the south parcel was foreclosed on, and the Hancocks subsequently vacated the south parcel.

Randy Wood, the haymaker the Hoffmans hired to hay the north parcel, also testified. Wood testified that he has hayed the north parcel for the past 12-13 years, and started haying the back field of the south parcel a few years later. Wood hayed once per year. He would start by haying the north parcel, and then cross over to the back field of the south parcel from the north parcel. Wood would pass through two T-posts where a fence used to be, but no longer existed. Wood additionally stated that in the vicinity of a telephone pole, there was a fence running toward Winlock-Vader Road.

Paul Collins testified that there was a short-plat subdivision of the north parcel in 1998, and he and his spouse, Lisa, purchased this subdivided plot from Lisa's parents, Alfred and Diana Hoffman. The Collinses commissioned surveyor Fred Martin to do a survey of the entire north parcel as part of the subdivision. Once the survey was complete, Paul was aware that the 1962 fence was not on the property line. At the time of the 1998 survey, Paul noted that the 1962 fence had deteriorated. Wooden posts had rotted out and fallen, and the barbed wire had separated from the posts. Once Paul and Lisa moved onto their plot, Paul took over maintenance of the disputed property for Alfred, and began removing the 1962 fence.

---

[3] This path eventually became the upper road that the Staleys used to access the back field.

Lynnette Hoffman testified that Doris Robinette and Doris' daughter would mow along the driveway of the south parcel on the disputed property. Lynnette also explained that there had been a dispute between the Hoffmans and the Hancocks. Further, Lynnette stated that the south parcel remained without tenants for three years after the Hancocks vacated the property. She also testified that after Paul and Lisa moved onto their plot, Paul additionally began removing dead trees and planting new trees.[4] Some of the trees Paul planted were on the disputed property.

Lisa Collins testified that her husband, Paul, purchased and planted over 300 saplings for the north parcel. Lisa further testified that whenever any southern neighbors had asked to use the disputed property, the Hoffmans were always neighborly and granted permission. The Hancocks, specifically, had permission to enter the back field using the disputed property. Lisa also testified that the Hoffmans later gave the Staleys permission to use the disputed property.

Cheryl Staley testified that she and her husband, Terry, purchased the south parcel in 2014. The Staleys did not have the south parcel inspected or surveyed before completing the sale. When they went to look at the property, the two sides of the fence appeared to be maintained differently. Cheryl confirmed that she and Terry received a copy of the title report, which showed that the property line did not conform to the fence line. However, the Staleys believed that the 1962 fence line marked the property line because, based on the physical property and aerial images, the fence appeared to go around a natural land formation. Cheryl testified that the 1962 fence was at the top of a hill, and the fence followed the natural contours of the land. When the Staleys purchased the

---

[4] Kennedi Collins, daughter of Paul and Lisa, testified that Paul would buy these trees to plant every spring, and would wait until the weather was nice to plant them on the north parcel.

south parcel, the area around the path that became the upper road was overgrown with two feet of grass.

The 1998 survey from the subdivision of the north parcel was admitted as an exhibit. That survey showed the location of the 1962 fence and that, by 1998, it did not extend all the way to the Olequa Creek and did not conform to the property line.

The Staleys' title report was also admitted. The title report showed that three easements had been made out by the Staleys' predecessors, including two easements for power poles made to a power line company. Like the 1998 survey, the title report stated that the 1962 fence between the north and south parcels did not conform to the property line. And a copy of Lewis County title documents was admitted, showing that the Staleys purchased the south parcel in September of 2014.

Copies of easements made by Jacob Orni to a power company in Lewis County were introduced. The easements granted the power company the right to place power poles in specific locations on the south parcel.

A survey completed by surveyor Shannon Ohnemus was admitted through his testimony at trial. The survey showed the power poles were located north of the property line and not on the south parcel where Jacob Orni granted the easement for the power poles. From this exhibit, Ohnemus confirmed that the power pole easements granted by the Staleys' predecessors only described the south parcel.

IV. TRIAL COURT'S DECISION

Following the close of testimony, the trial court issued an initial memorandum decision prior to formal findings of fact and conclusions of law that quieted title for the Hoffmans but did

not address the driveway. Following the trial court's initial memorandum decision but before it entered formal findings of fact and conclusions of law, the Staleys moved for clarification. Noting that the trial court's memorandum did not specifically address the claim for adverse possession of the driveway, the Staleys requested that the trial court at least quiet title to them for the portion of their driveway that encroached on the north parcel.

The Staleys asserted that historic use of the driveway established adverse possession. They pointed out that during the trial, a witness, Eileen Wideman, testified that she lived on the south parcel as a child in the 1940s and 1950s and the south parcel driveway was the same driveway that is seen in a photograph from the 1940's.

The Hoffmans responded that the Staleys could not prove the driveway encroachments had been in place for a sufficient duration. They asserted that aerial photographs of the north and south parcels show that the driveway of the south parcel did not begin encroaching on the north parcel until after the Staleys had purchased the property in 2014 and Wideman did not testify that the present driveway was in the exact same location as when she lived there.

The trial court clarified that its order quieting title in favor of the Hoffmans applied to the driveway as well. The trial court then issued its written findings of fact and conclusions of law consistent with its clarified decision. The trial court's findings of fact stated:

> I. Eileen Wideman was born in 1940 at 883 Winlock-Vader Road, Winlock, WA and raised there until she was about ten years old. Her parents were Sylvia Fredricka Orni and Elmar Jacob Orni, and her grandfather was Jacob Orni, who owned the property.
>
> II. At the time, Arvil and Ellen Turula owned the property to the north, 871 Winlock-Vader Road, Winlock, WA. At the time there was a barbed-wire and wooden fence, which Jacob Orni built at some point, running in a straight line between the two properties, from the main road down to Olequa Creek.

10

III. The fence was old, and the Turulas used and maintained it to keep animals on their property. There was a gate in the fence in the back field, where the Ornis gave the Turulas permission to enter their property and cross the creek.

IV. Archie Curtis lived across the street from 883 Winlock-Vader Road from approximately 1952, when he was seven or eight years old, to 1962. At the time, the residents of 883 Winlock-Vader Road were the Walline family, renting it from the Ornis, and the property to the north was still owned by the Turulas.

V. As a child, Mr. Curtis would help steer the tractor used in haying the back field of 883 Winlock-Vader Road. At the time, a fence ran in a straight line between the Ornis' property and the Turulas' property, from the main road down to Olequa Creek. The driveway was graveled and curved around the house from the road and went towards [sic] back field.

VI. John W. Jacoby lived at 883 Winlock-Vader Road with his parents, John and Doris Jacoby, from around 1960, when he was approximately four years old, to 1974.

VII. In around 1962, Mr. Jacoby Sr. and Mr. Turula either built or rebuilt a fence between their properties. For four or five days, the five or six year old Mr. John Jacoby offered a limited amount of help placing this fence. There is no evidence in the record as to when in 1962 the fence was constructed. Due to his age of five or six years old, and his perception of Mr. Turula, John Jacoby's testimony that he believed the fence must have been on the property line because of the reputation of Mr. Turula is not evidence of any intent that the fence represents the actual boundary line.

VIII. This fence constructed in 1962 was not the same fence as the one which Mr. Orni had previously built; it did not run in a straight line, but rather ran along the driveway on the north side of the property, turned at a right angle near the house, and then went in a straight line down to Olequa Creek, north of a plum grove.

IX. The fence followed the natural contours of the land. Mr. John Jacoby helped his parents maintain the fence as he grew up, believing it represented the property line. However, no explicit agreement between the Turulas and the Jacobys established that this was actually the case.

X. The fence was built to corral cattle which Mr. Jacoby Sr. wanted to raise. The Jacobys would sometimes use a "lower road" to access the property's back field but would not use any "upper road."

XI. Alfred and Diana Hoffman purchased the real property located at 871 Winlock-Vader Road in August 1972, and moved there with their children, including Lynnette Hoffman and Lisa Collins.

11

XII.  At or about the time of purchase, Mr. Hoffman commissioned a surveyor to mark the property's corners.  At the time the property to the south, 883 Winlock-Vader Road was owned by the Robinettes (Kenneth and Doris, formerly Doris Jacoby).

XIII.  The Hoffman property was mainly used for cattle (around ten) and hay; there were numerous cattle fences on the Hoffman lot, with one being the fence between the Hoffman lot and the Robinette lot which Mr. Turula and Mr. Jacoby Sr. had built.

XIV.  Mr. Hoffman used this fence between the Hoffman Lot and the Robinette lot to keep his cows in, until he stopped having cows on the property in about 1985.  After this, he stopped maintaining the southern fence lying between the properties.

XV.  Mr. Hoffman never moved the fence to align with the surveyed property line because he did not consider it worth the trouble; Mr. Hoffman, Lynnette Hoffman, and the Robinettes knew the fence was just a cattle fence, separate and different from the actual property line.  Mr. Hoffman would thus also often mow and remove tansy growing south of the fence, and would pick fruit from the trees there, while Mrs. Robinette and her daughter would sometimes mow about three feet north of their driveway.

XVI.  In 1998, Mr. Hoffman's daughter Lisa Collins, and her husband Paul Collins, had a short-plat subdivision of the Hoffman lot done and acquired a portion of the Hoffman lot now known as 871-A Winlock[-]Vader Road.

XVII.  To formalize the short-plat and create their lot, a survey of the Hoffman lot was performed by Fred Martin.  The survey indicated the fence on the south side of the Hoffman lot, but also that it was not solid and continuous; it terminated short of the eastern boundary of the Hoffman lot and did not represent the surveyed property line between the Hoffman lot and the Robinette lot.  At the time, Ms. Collins knew the fence was not the property line.

XVIII.  Due to Mr. Hoffman's declining health, Mr. Collins took care of all maintenance of the Hoffman lot; he began taking down the 1962 fence.  The fence was barbed wire, a combination of metal and wood posts, the latter of which were rotting and overgrown.  He also mowed, removed dead trees, and planted new trees around the perimeter of the property, some of which were south of the old fence line but north of the surveyed line.  Mr. Collins continued to annually plant trees, usually in the spring, eventually numbering several hundred.

XIX.  Kennedi Collins, the Collinses' daughter, also lived at 871-B Winlock-Vader Road from approximately 1998 to 2016, and still frequently visits the Collins and Hoffman lots.  During that time, a new fence was added in the front of the property, but what remained of the old, rotten fencing was not in a solid line.  Growing up, she did not consider that old fence line the property line, and her parents gave her permission to go beyond it.

XX. Mr. John Jacoby became his mother's attorney in fact in around 2006. Mr. Robinette passed away in 2007 or 2008. When Mrs. Robinette subsequently was moved to an assisted living facility, Mr. Jacoby continued to maintain the property.

XXI. Mr. John Jacoby then, as attorney in fact for his mother Doris Robinette, sold 883 Winlock-Vader Road to his daughter, Sara Cynthia Hancock, and her husband, Curtis Hancock, in August 2007.

XXII. Between the time Ms. Robinette was moved to an assisted living facility and the time of sale, the property was vacant for at least several months.

XXIII. As customary, as a part of the sale, Lewis County Title Company provided both Mr. Jacoby and Ms. Hancock with a title report which stated as an exception that the fence between 883 Winlock-Vader Road and 871 Winlock-Vader Road did not conform to the surveyed boundary line.

XXIV. By this time, the barbed-wire fence was not continuous and was deteriorating in some places. A path to the Hancocks' back field passed over part of the Hoffman lot, but Ms. Hancock did not ask the Hoffmans or Collinses for permission to pass through this area, because she did not believe it was necessary to do so.

XXV. A few years later, a dispute arose between Ms. Hancock and the Hoffmans over Mr. Collins removing some of the old remnants of fence.

XXVI. Lynnette Hoffman hired an attorney, Steven King, to draft an agreement granting the Hancocks permission to cross the Hoffmans' land to access the Hancocks' back field. In 2009 or 2010, Ms. Hoffman and the Hancocks negotiated several versions of the proposed agreement, but the latter ultimately refused to sign.

XXVII. Ms. Lynnette Hoffman moved back onto 871-A Winlock-Vader Road in around 2011. In late 2010 or early 2011, Mr. Collins erected a series of white fence posts along the surveyed boundary line of the Hoffman lot. However, the Hancocks removed these posts because they believed them to be within the bounds of their own property, and a safety hazard for when they rode bikes through their back field. Ms. Hancock spoke with Mr. Collins about these posts at one point; the two disagreed about whether the posts were on or over the property line. The two sides would thus regularly remove and then replace the posts.

XXVIII. Mrs. Robinette passed away in 2011. Ms. Hancock left the property in October or November 2011, and Mr. Hancock followed shortly thereafter. The Hancocks fully vacated the property in May 2012, and it was foreclosed upon.

XXIX. The property at 883 Winlock[-]Vader Road remained without occupants for about three years and there is no evidence that it was maintained during that time period.

XXX.  Ms. Lynnette Hoffman and the Collinses decided that, because of the dispute with the Hancocks, they would immediately let the next owners of the property know about the discrepancy with the fence.

XXXI.  In 2011 or 2012, Mr. Collins erected a fence near the Hancocks' driveway, and continued to remove the rest of the old fence.

XXXII.  Cheryl and Terry Staley purchased 883 Winlock-Vader Road from Wells Fargo Bank, N.A., upon a special warranty deed dated August 20, 2014.

XXXIII.  The Staleys had looked at aerial maps of the property before their purchase, but never reviewed any county records, and did not research the history of the property.

XXXIV.  Prior to closing, the Staleys received and signed off on a title report dated July 26, 2014, which provided as an exception that the surveyed property line did not conform with the fence line.  They also received as part of their title report a copy of the 1998 short-plat survey of the Hoffman lot showing the fence line depicted thereon did not conform to the property line.  Ms. Staley testified that she assumed the fence line was the property line and that is what she thought she purchased.  Ms. Staley was not a credible witness.

XXXV.  The Staleys inspected the house themselves before purchasing it, but did not inspect the larger property until June 2014.

XXXVI.  The Staleys did not have a formal inspection of the properly performed, and specifically waived their right to do so before purchasing it.  By this time, only some old, overgrown fence posts with intermittent wiring remained of the fence.

XXXVII.  At the time of their purchase in 2014, the path the Staleys would eventually use over the surveyed bounds of the Hoffman lot and into their back field was overgrown with about two feet of grass.  However, the Staleys interpreted these old posts, as well as a distinction in vegetation between the properties, as indicating the property line.  Ms. Staley's testimony is not credible.

XXXVIII.  The Staleys visited Mr. Hoffman, Mrs. Hoffman, and Ms. Hoffman for the first time in August 2014, at the Hoffmans' home, to let them know they were moving in.  They briefly discussed the distinction between the fence line and the property line.  Ms. Hoffman generally pointed out the boundary line and its distinction from the property line, but Mr. Hoffman told the Staleys to talk to Mr. Collins with any questions about the land.

XXXIX.  In late 2014[,] the Staleys had a surveyor locate the corners of their property, although they were not marked, and no survey was ever recorded.  However, this confirmed for the Staleys that the survey line and the old fence line were not the same.

XL.  In 2016, Mr. Hoffman deeded to Ms. Hoffman, along with her husband Thomas Hoffman and the Collinses, each a one-third interest in the Hoffman lot.

XLI. After this transfer of interest, the Collinses had a surveyor mark the surveyed boundary line. In 2019, Mr. Collins erected a series of fence posts to mark this line further, which the Staleys believed to be encroaching on their property. After being threatened with legal action, Mr. Collins removed a post to allow the Staleys passage along the driveway to the back field.

XLII. Some of the survey stakes which marked the line were removed or damaged on or around April 1, 2020, some by the Staleys' children. The children then placed a series of vehicles along the property line to stop Mr. Collins from building another fence.

XLIII. In approximately July 2019, the Hoffmans grew concerned about campers utilizing a campground in the back field of the Staley property upon noticing increased vehicle traffic across a portion of the Hoffman lot.

XLIV. Ms. Lynnette Hoffman approached Mr. Staley about this concern and was told by Mr. Staley that they had a "right of way" to cross over the Hoffman lot to reach their back field.

XLV. Ms. Hoffman and Ms. Staley then exchanged text messages about this on July 16, 2019, with Ms. Hoffman asking for proof of the right-of-way; Ms. Staley references four easements which did not affect the Hoffman lot. The next day, the two spoke on the phone, and Ms. Hoffman said that she did not want people crossing the Hoffman property and that she was concerned about liability and the increased traffic of people crossing over the Hoffman lot.

XLVI. In approximately July 2019, and through most of August, the Staleys put up a rope along part of their property line, which ran roughly along the surveyed boundary line between the properties. The Staleys told Ms. Hoffman this was to keep campers from coming onto the Hoffman lot. The Staleys would mow up to the rope line.

XLVII. After ordering a title report and confirming that the Staleys had no easements or right-of-ways across the Hoffman lot, Ms. Hoffman sent the Staleys a letter dated July 29, 2019 demanding that campers stop using their property and that the Staleys stop maintaining any part of the Hoffman lot, and stating the Hoffmans would build a fence on their boundary line.

XLVIII. The Staleys responded through counsel with a letter dated August 8, 2019 demanding that the Hoffmans cease and desist from building a fence in the surveyed boundary line, and to cede the disputed area to the Staleys.

XLIX. The Staleys thereafter ceased operation of a commercial campground allowing only friends and family to occasionally camp there. The Staleys continued to cross over the Hoffman lot to enter their back field, and would occasionally mow part of the disputed area north of the driveway. The Staleys graveled and improved portions of the upper roadway they claimed as theirs. By order of the court during

15

reciprocal injunction hearings, the Staleys are required to restore that portion of the Hoffman property.

L. In August of 2019, the Hoffmans had John Goodman of Goodman Land Surveying produce a retracement survey of the Hoffman lot. Goodman also surveyed a portion of the Staley lot relative to the disputed area. The survey was wholly consistent with the 1998 one, although by this time the fence from the 1998 survey no longer existed, and so it was not marked.

LI. In July 2020, Shannon Lee Ohnemus, working with Schinnell Surveying & Mapping, surveyed 883 Winlock-Vader Road as well. This survey, too, was consistent with the 1998 survey of 871 Winlock-Vader Road and its successors.

LII. There are three separate easements across the Staleys' property, one being a power line easement for Lewis County PUD. However, the power lines themselves are north of the Staley[s'] deeded northern property line, within the southerly 150 feet of the Hoffman lot. These easements, and the placement of utility poles, have nothing to do with the fence line, and do not grant the Staleys any right to use or access the Hoffman lot.

LIII. Randy Wood has hayed the fields at the Hoffman property once a year for the last twelve to thirteen years, and the Staley property for nearly as long. Mr. Wood would hay the Hoffmans' field first, then pass over into the Staleys' back field across the former fence line and hay it. However, there has been no fence in the area for all of that time, just two T-posts. There was only a fence along the driveway by Winlock-Vader Road, running up to a telephone pole.

LIV. There is no evidence as to when John Jacoby Sr. built the pre-1962 fence between the properties and where it stood in relation to either the deeded line or any subsequent fence. Plaintiffs have failed to establish that this straight fence has any bearing on establishing their claims.

LV. Overall, the southern fence was only ever maintained when there were cows in either property's field, such maintenance ceasing in approximately 1985.

LVI. The Hoffmans never gave the Staleys a right to use their property, orally or in writing. There is no credible evidence that the Staleys or their predecessors enjoyed an historic use of the upper road to access the lower Staley field to establish a prescriptive right.

LVII. Any use made of any portion of the Hoffman lot by the Staleys or their predecessors was with the permission of the Hoffmans or their predecessors as a neighborly accommodation.

CP at 733-44. The trial court entered the following conclusions of law:

1. The court has jurisdiction of the parties and the subject matter of this action.

16

2. The Hoffmans hold legal title to the Hoffman Lot up to the surveyed boundary line of record.

3. The Plaintiffs have failed to satisfy their burden of proof upon a claim of adverse possession. The evidence does not show that the land south of the 1962 fence has ever actually been used openly and exclusively by the Plaintiffs or their predecessors in interest for at least ten continuous years.

4. There is no evidence as to when in 1962 the fence was constructed. It is the Plaintiff's burden to show that all of the elements of adverse possession existed for the duration of the ten year period.

5. The evidence shows that Alfred Hoffman purchased his property in August of 1972 and did not accept the fence line as the boundary line from that date, using property on the south side of the cattle fence as his own.

6. The Plaintiffs' failure to meet their burden and failure to establish a continuous ten year period of adverse use is fatal to their claim.

7. The Plaintiffs have failed to satisfy their burden of proof upon a claim of mutual recognition and acquiescence. The 1962 fence has been historically intended, used, and recognized by the parties and their predecessors in interest as a cattle fence, not a property line or as a demarcation of a boundary line. The respective acts, occupancy and improvements to the fence and the land directly on either side of the cattle fence support this characterization.

8. The Plaintiffs have failed to satisfy their burden of proof upon a claim of prescriptive easement. There is no credible evidence of any historic use by Plaintiffs or their predecessors in interest of accessing their back field by use of an "upper road" across the Hoffman Lot. The existence of utility easements on either parties' property is irrelevant to this determination.

9. Judgment should be entered in favor of the Hoffmans and against the Plaintiffs, for the following:

   a. A decree and quieting title in the name of the Hoffmans, and each of them, to the entirety of the Hoffman Lot up to the legally described surveyed boundary line of record.

   b. Ordering that the Plaintiffs remove those developments made by them to the Hoffman Lot at their sole expense, including in particular the graveling of the path to the back field and any structures located within the bounds of the Hoffman Lot.

10. The Hoffmans should recover their statutory costs from the Plaintiffs pursuant [to] RCW 4.84.030.

11. Any claim for an award of attorney fees shall be by petition to this court.

CP at 744-46.

V.  ATTORNEY FEES

Following the trial court's decision, the Hoffmans moved for an award of attorney fees, and the Staleys objected.  The trial court awarded the Hoffmans attorney fees, deciding that because the Staleys were on notice of the true property line from the 1998 recorded survey, the Staleys' lawsuit was unnecessary.  The trial court entered judgment against the Staleys and granted a decree of quiet title for the Hoffmans.

The Staleys appeal.

## ANALYSIS

I.  LEGAL PRINCIPLES

We review a trial court's findings of fact following a bench trial to determine whether those findings are supported by substantial evidence.  *In re Estate of Barnes*, 185 Wn.2d 1, 9, 367 P.3d 580 (2016).  Substantial evidence is that which is sufficient to persuade a fair-minded person of the truth of the premise.  *In re Marriage of Condie*, 15 Wn. App. 2d 449, 459, 475 P.3d 993 (2020).

We do not reweigh evidence or substitute our opinions for the trier of fact.  *Bale v. Allison*, 173 Wn. App. 435, 458, 294 P.3d 789 (2013).  Instead, we review the record in a light most favorable to the prevailing party to determine if substantial evidence supports the trial court's findings of fact.  *Harrison Mem'l Hosp. v. Gagnon*, 110 Wn. App. 475, 485, 40 P.3d 1221, *review denied,* 147 Wn.2d 1011 (2002).  Further, we do not review determinations of witness credibility found by the trial court.  *Morse v. Antonellis*, 149 Wn.2d 572, 574-75, 70 P.3d 125 (2003).  We also defer to the trial court's determinations regarding conflicting testimony.  *State v. Curtiss*, 161 Wn. App. 673, 693, 250 P.3d 496, *review denied,* 172 Wn.2d 1012 (2011).

Assignments of error to findings of fact that are not argued in a brief are abandoned on appeal. *In re Marriage of Glass*, 67 Wn. App. 378, 381 n.1, 835 P.2d 1054 (1992). And, unchallenged findings of fact are verities on appeal. *Harris v. Urell*, 133 Wn. App. 130, 137, 135 P.3d 530 (2006), *review denied*, 160 Wn.2d 1012 (2007).

We then review conclusions of law de novo to determine if they are supported by the findings of fact. *Scott's Excavating Vancouver, LLC v. Winlock Props., LLC*, 176 Wn. App. 335, 342, 308 P.3d 791 (2013), *review denied*, 179 Wn.2d 1011 (2014). Further, we review conclusions of law erroneously labeled as findings of fact as conclusions of law. *Id.*

II. FINDINGS OF FACT

The Staleys specifically challenge twenty separate findings of fact entered by the trial court. We address each to determine whether the trial court's findings are supported by substantial evidence.

First, the Staleys assign error to the trial court's finding:

> III. The fence was old, and the Turulas used and maintained it to keep animals on their property. There was a gate in the fence in the back field, where the Ornis gave the Turulas permission to enter their property and cross the creek.

CP at 733. This finding of fact is supported by Wideman's testimony. This finding references the old, straight fence built by Jacob Orni. Wideman testified that the fence was "older," and that there was a gate in the fence. VRP at 122. Further, she testified that the fence was used and maintained to keep animals on the Turulas' property, and the Ornis gave the Turulas permission to enter the south parcel and cross the creek. There is substantial evidence for the fair-minded person to be persuaded that this finding of fact is true.

Second, the Staleys assign error to the trial court's finding of fact:

19

VII. In around 1962, Mr. Jacoby Sr. and Mr. Turula either built or rebuilt a fence between their properties. For four or five days, the five or six year old Mr. John Jacoby offered a limited amount of help placing this fence. There is no evidence in the record as to when in 1962 the fence was constructed. Due to his age of five or six years old, and his perception of Mr. Turula, John Jacoby's testimony that he believed the fence must have been on the property line because of the reputation of Mr. Turula is not evidence of any intent that the fence represents the actual boundary line.

CP at 734. This finding of fact is supported by the testimony of John Jacoby and Archie Curtis (neighbor of the Turulas). Jacoby testified that he and his father helped Turula build the new fence in 1961 or 1962 and that he helped for four or five days. Curtis testified that when he left town to join the Marine Corps in May or June of 1962, the old, straight fence still existed. No further evidence was provided to show precisely when in 1962 the 1962 fence was constructed. Further, the trial court has broad discretion to determine whether testimony is reliable or persuasive, and we defer to the trial court's determination that Jacoby's youth at the time of the fence construction affected the reliability of his testimony about whether the fence was originally intended to be on the boundary line. *See Morse*, 149 Wn.2d at 574-75.

The Staleys argue in their brief that evidence of the old fence's location refutes this finding of fact. But the Staleys do not persuasively explain why the location of the old fence has any bearing on the 1962 fence, and in any event, we do not reweigh evidence. *Bale*, 173 Wn. App. at 458. Evidence that refutes a finding of fact is not considered when determining whether a finding of fact is supported by substantial evidence in the record. *See id*. There is substantial evidence supporting this finding of fact.

Third, the Staleys assign error to the trial court's finding of fact:

VIII. This fence constructed in 1962 was not the same fence as the one which Mr. Orni had previously built; it did not run in a straight line, but rather ran along the

20

> driveway on the north side of the property, turned at a right angle near the house, and then went in a straight line down to Olequa Creek, north of a plum grove.

CP at 734. This finding of fact is supported by Archie Curtis', Eileen Wideman's, and Cheryl Staley's testimony, as well as aerial images and land surveys. Curtis and Wideman both testified that the old fence went in a straight line from Winlock-Vader Road back to the Olequa Creek. Cheryl testified that the 1962 fence was built at the top of a hill and the fence followed the natural contours of the land. Aerial images and land surveys show that the fence ran north of the south parcel driveway, curved east of the Staley house, and then ran in a straight line to the Olequa Creek. There is substantial evidence supporting this finding of fact.

Fourth, the Staleys assign error to the trial court's finding of fact:

> IX. The fence followed the natural contours of the land. Mr. John Jacoby helped his parents maintain the fence as he grew up, believing it represented the property line. However, no explicit agreement between the Turulas and the Jacobys established that this was actually the case.

CP at 734. This finding of fact is supported by Cheryl Staley's and John Jacoby's testimony. Cheryl herself admitted that the fence followed the natural contours of the land and the fence was at the top of a hill before the hill sloped down in elevation. Jacoby testified that he helped maintain the fence when he was a child, and he believed the fence was the property line. Further, Jacoby testified that he did not know of an agreement between his parents and the Turulas that the fence was the property line. No further evidence was provided that would show an agreement between the Jacobys and the Turulas. There is substantial evidence to support this finding of fact.

Fifth, the Staleys assign error to the trial court's finding of fact:

> X. The fence was built to corral cattle which Mr. Jacoby Sr. wanted to raise. The Jacobys would sometimes use a "lower road" to access the property's back field but would not use any "upper road."

21

CP at 734. This finding of fact is supported by John Jacoby's testimony. Jacoby testified that the purpose of building the 1962 fence was so his father could raise cattle. He also testified that his family would access the back field by a lower road by the Olequa Creek. No evidence was admitted that the Jacoby family used any upper road to access the back field. There is substantial evidence to support this finding of fact.

Sixth, the Staleys assign error to the trial court's finding of fact:

XIII. The Hoffman property was mainly used for cattle (around ten) and hay; there were numerous cattle fences on the Hoffman lot, with one being the fence between the Hoffman lot and the Robinette lot which Mr. Turula and Mr. Jacoby Sr. had built.

CP at 735. This finding of fact is supported by Alfred Hoffman's testimony. Alfred stated during his deposition that the fence was used to keep his cattle on his property and his property was hayed. Alfred further stated that when he bought the north parcel, there were multiple cattle fences on the property, including one between the north and south parcels. There is substantial evidence supporting this finding of fact.

Seventh, the Staleys assign error to the trial court's finding of fact:

XIV. Mr. Hoffman used this fence between the Hoffman Lot and the Robinette lot to keep his cows in, until he stopped having cows on the property in about 1985. After this, he stopped maintaining the southern fence lying between the properties.

CP at 735. This finding of fact is supported by Alfred Hoffman's testimony. Alfred stated in his deposition that the fence was used to keep his cows in, he stopped keeping cattle on the property after around 1985 to 1987, and maintained the fence to keep in his cattle.

The Staleys claim that evidence of the old fence's location refutes this finding of fact. Again, the old fence's location has no bearing on the 1962 fence, and we do not consider evidence

that refutes the trial court's findings of fact when determining whether substantial evidence supports a finding of fact. *See Bale*, 173 Wn. App. at 458. We assess whether substantial evidence supports the finding of fact, not whether conflicting evidence exists. *See id.* Substantial evidence in the record supports this finding of fact.

Eighth, the Staleys assign error to the trial court's finding of fact:

XV. Mr. Hoffman never moved the fence to align with the surveyed property line because he did not consider it worth the trouble; Mr. Hoffman, Lynnette Hoffman, and the Robinettes knew the fence was just a cattle fence, separate and different from the actual property line. Mr. Hoffman would thus also often mow and remove tansy growing south of the fence, and would pick fruit from trees there, while Mrs. Robinette and her daughter would sometimes mow about three feet north of their driveway.

CP at 735. This finding of fact is supported by Alfred and Lynette Hoffman's testimony. Alfred stated that he didn't bother to move the fence because "there was no sense in moving [the fence] when it was still working" and it would have been "a lot of work." CP at 492, 497. He also stated that the Robinettes knew the fence was not the property line. Alfred would mow the grass south of the fence, remove tansy from the area south of the fence, and pick plums from the grove. Alfred gave the Robinettes permission to mow the strip of grass around the Robinettes' driveway. Lynnette testified that Doris Robinette and Doris's daughter would mow next to the driveway.

The Staleys also refute this finding with evidence of the old fence's location. Even if that evidence was relevant to this finding of fact, we do not reweigh evidence; we only determine whether substantial evidence supports a finding of fact. *Bale*, 173 Wn. App. at 458. There is substantial evidence to support this finding of fact.

23

Ninth, the Staleys assign error to the trial court's finding of fact:

XVII. To formalize the short-plat and create their lot, a survey of the Hoffman lot was performed by Fred Martin. The survey indicated the fence on the south side of the Hoffman lot, but also that it was not solid and continuous; it terminated short of the eastern boundary of the Hoffman lot and did not represent the surveyed property line between the Hoffman lot and the Robinette lot. At the time, Ms. Collins knew the fence line was not the property line.

CP at 736. This finding of fact is supported by the 1998 survey and Paul Collins' testimony. The survey document clearly shows that Fred Martin performed the survey and shows the fence line as it existed in 1998. The fence on the survey did not extend to the eastern border of the Hoffman lot and clearly was not aligned with the property line. Paul testified that at the time of the survey, the wooden fence posts had rotten out and fallen, and the barbed wire separated from the posts. He also stated that once the survey was completed, he knew then that the fence was not the property line. There is substantial evidence to support this finding of fact.

Tenth, the Staleys challenge the trial court's finding of fact:

XVIII. Due to Mr. Hoffman's declining health, Mr. Collins took care of all maintenance of the Hoffman lot; he began taking down the 1962 fence. The fence was barbed wire, a combination of metal and wood posts, the latter of which were rotting and overgrown. He also mowed, removed dead trees, and planted new trees around the perimeter of the property, some of which were south of the old fence line but north of the surveyed line. Mr. Collins continued to annually plant trees, usually in the spring, eventually numbering several hundred.

CP at 736. This finding of fact is supported by the testimony of Paul, Lisa, and Kennedi Collins, and Lynette Hoffman. Paul testified that he began maintaining the property and began removing the 1962 fence. Paul additionally testified about the condition of the fence and the materials the fence was made of, consistent with this finding of fact. Lynnette testified that Paul removed dead trees and planted new ones, including some south of the 1962 fence. Kennedi testified that her

father planted trees every year and would get new trees to plant in the spring, planting them when the weather was nice. Lisa testified that Paul had planted over 300 saplings. There is substantial evidence to support this finding of fact.

Eleventh, the Staleys assign error to the trial court's finding of fact:

XXV. A few years later, a dispute arose between Ms. Hancock and the Hoffmans over Mr. Collins removing some of the old remnants of fence.

CP at 737. This finding of fact is supported by Sara Hancock's and Lynette Hoffman's testimony. Sara herself testified that Paul Collins removed old fence posts. She continued to describe that the Hoffman family and the Hancocks had a dispute over an attempted agreement with the property line. Lynnette also testified about the dispute that arose with the Hancocks. There is substantial evidence to support this finding of fact.

Twelfth, the Staleys assign error to the trial court's finding of fact:

XXIX. The property at 883 Winlock[-]Vader Road remained without occupants for about three years and there is no evidence that it was maintained during that time period.

CP at 738. This finding of fact is supported by Lynette Hoffman's and Sara Hancock's testimony. Lynnette testified that the south parcel remained without tenants for three years after the Hancocks moved. Further, Sara testified that they vacated the south parcel in 2011, and the record shows that the Staleys purchased the south parcel in 2014. No evidence was admitted showing that the south parcel was maintained during the three years that it was vacant. There is substantial evidence to support this finding of fact.

Thirteenth, the Staleys assign error to the trial court's finding of fact:

XXXIV. Prior to closing, the Staleys received and signed off on a title report dated July 26, 2014, which provided as an exception that the surveyed property line did

> not conform with the fence line. They also received as part of their title report a copy of the 1998 short-plat survey of the Hoffman lot showing the fence line depicted thereon did not conform to the property line. Ms. Staley testified that she assumed the fence line was the property line and that is what she thought she purchased. Ms. Staley was not a credible witness.

CP at 739. This finding of fact is supported by the Staleys' title report and Cheryl Staley's testimony. The Staleys' title report clearly indicates that the fence line did not conform to the property line. Cheryl testified that the property line was disclosed from a 1998 survey (the short-plat survey), but she and her husband, Terry, believed the fence line was their property line anyway.

The Staleys challenge the trial court's determination that Cheryl is not a credible witness, but we do not review credibility determinations made by the trial court. *Morse*, 149 Wn.2d at 574-75. There is substantial evidence to support this finding of fact.

Fourteenth, the Staleys assign error to the trial court's finding of fact:

> XXXVII. At the time of their purchase in 2014, the path the Staleys would eventually use over the surveyed bounds of the Hoffman lot and into their back field was overgrown with about two feet of grass. However, the Staleys interpreted these old posts, as well as a distinction in vegetation between the properties, as indicating the property line. Ms. Staley's testimony is not credible.

CP at 740. This finding of fact is supported by the testimony of Sara Hancock and Cheryl Staley. Sara testified that her family created a path with their dirt bikes and mowed the path a few times before vacating the south parcel. Cheryl testified that the area was overgrown with about two feet of grass when the Staleys purchased the property. She also testified that there was a difference in maintenance on the different sides of the fence, and she believed this indicated the property line.

Again, the Staleys challenge the determination that Cheryl was not a credible witness, and we do not review witness credibility determinations made by the trial court. *Morse*, 149 Wn.2d at 574-75. There is substantial evidence to support this finding of fact.

Fifteenth, the Staleys assign error to the trial court's finding of fact:

> LII. There are three separate easements across the Staleys' property, one being a power line easement for Lewis County PUD. However, the power lines themselves are north of the Staley[s'] deeded northern property line, within the southerly 150 feet of the Hoffman lot. These easements, and the placement of utility poles, have nothing to do with the fence line, and do not grant the Staleys any right to use or access the Hoffman lot.

CP at 743. This finding of fact is supported by the evidence of the three easements, one being for Lewis County, from the Staleys' title report and the 1998 survey from the north parcel subdivision. The Staleys' title report shows that there were three easements burdening the south parcel, including two granted to a powerline company. The deeds for the two easements to the power line company were both recorded in Lewis County. The 1998 survey from the Hoffman subdivision shows the location of the power poles entirely on the north parcel and, therefore, directly supports that the power poles were within the Hoffman lot.

Additionally, no evidence was submitted that the power poles have any relationship with the fence line. The easements clearly show the Staleys' south parcel predecessor, Jacob Orni, and the power company were the only parties to these easements, and the easements do not describe any property within the bounds of the north parcel. Further, surveyor Ohnemus testified that the property descriptions for the locations of the power poles as described in the easements fall completely within the south parcel. There is sufficient evidence to persuade a fair-minded person of the truth of this finding of fact.

The Staleys challenge this finding of fact by asserting that Jacob Orni permitted the local government to build the power poles, and only the owner of the described property could convey that interest by an easement—thereby demonstrating that Orni was claiming authority over, and ownership of, portions of the north parcel. As shown below, this argument is unpersuasive. But in any event, the argument does not affect the question of whether substantial evidence supports this finding of fact. The power poles were actually placed on the north parcel, not on the south parcel where Orni provided the easement. The permission Orni gave for the power poles does not change the fact that the easements only describe the south parcel, and does not show how the above evidence is insufficient to support the finding of fact. Again, we do not reweigh evidence. *Bale*, 173 Wn. App. at 458. There is sufficient evidence to support this finding of fact.

Sixteenth, the Staleys assign error to the trial court's finding of fact:

LIII. Randy Wood has hayed the fields at the Hoffman property once a year for the last twelve to thirteen years, and the Staley property for nearly as long. Mr. Wood would hay the Hoffmans' field first, then pass over into the Staleys' back field across the former fence line and hay it. However, there has been no fence in the area for all of that time, just two T-posts. There was only a fence along the driveway by Winlock-Vader Road, running up to a telephone pole.

CP at 743. This finding of fact is supported by Randy Wood's testimony. Wood testified that he hayed the Hoffman field for the past 12-13 years, and began haying the back field of the south parcel a few years later. He stated that he hayed once per year, starting with the Hoffmans' field. Wood further stated that he would pass from the north parcel to the back field of the south parcel between two T-posts where a fence used to be, but no longer existed. He further stated that there was a portion of fence in the vicinity of a telephone pole by Winlock-Vader Road. There is sufficient evidence to support this finding of fact.

Seventeenth, the Staleys assign error to the trial court's finding of fact:

LIV. There is no evidence as to when John Jacoby Sr. built the pre-1962 fence between the properties and where it stood in relation to either the deeded line or any subsequent fence. Plaintiffs have failed to establish that this straight fence has any bearing on establishing their claims.

CP at 744. No evidence was presented by either party about when the old fence was built, and the only testimony by witnesses who knew about the old fence was that the fence was straight. Because there is no evidence in the record showing when the old fence was built, there is sufficient evidence to persuade a fair-minded person of the truth of that aspect of this finding of fact.

However, the trial court's additional statement in this finding of fact that the Staleys "failed to establish that the straight fence has any bearing on their claims" is a conclusion of law mislabeled as a finding of fact. CP at 744. Accordingly, we address that conclusion of law below.

Eighteenth, the Staleys assign error to the trial court's finding of fact:

LV. Overall, the southern fence was only ever maintained when there were cows in either property's field, such maintenance ceasing in approximately 1985.

CP at 744. This finding of fact is supported by the testimony of Alfred Hoffman and Paul Collins. As previously stated, Alfred testified that he only maintained the fence to keep in his cattle and stopped raising cattle around 1985-1987. Paul testified that the fence had rotted out and fallen over by 1998. There is sufficient evidence to support this finding of fact.

Nineteenth, the Staleys assign error to the trial court's finding of fact:

LVI. The Hoffmans never gave the Staleys a right to use their property, orally or in writing. There is no credible evidence that the Staleys or their predecessors enjoyed an historic use of the upper road to access the lower Staley field to establish a prescriptive right.

29

CP at 744. This finding of fact is supported by John Jacoby's testimony. Jacoby testified that his family would use the lower road to access their back field when he was a child. It wasn't until the Hancocks moved onto the south parcel that the upper road began to develop from a dirt bike path to more of a road. Because Jacoby testified that his family used a lower road, there is sufficient evidence for a fair-minded person to be persuaded that there was no historic use of the upper road. Additionally, while Lisa Collins stated that her family gave the Staleys and their predecessors *permission* to use the disputed property, no evidence in the record supports that the Hoffmans ever officially conveyed a *right* to use the disputed property. There is substantial evidence that the Hoffmans did not give a right to use the disputed property.

The Staleys argue in their brief that their predecessors used the disputed property to access the back field without permission of the Hoffmans. Unsupported by any evidence or citation, this assertion simply refutes the trial court's finding of fact instead of explaining why substantial evidence is not present to support the finding of fact. Again, we do not reweigh evidence. *Bale*, 173 Wn. App. at 458. There is substantial evidence to support this finding of fact.

Twentieth, the Staleys assign error to the trial court's finding of fact:

LVII. Any use made of any portion of the Hoffman lot by the Staleys or their predecessors was with the permission of the Hoffmans or their predecessors as a neighborly accommodation.

CP at 744. This finding of fact is supported by the testimony of Alfred Hoffman and Lisa Collins. Alfred testified that the Robinettes knew the property line was not the fence line, and they mowed and used the disputed property with permission. Lisa further testified that the Hancocks had permission to enter the back field using the disputed property, and the Hoffmans also gave the Staleys permission to cross the disputed property. Lisa further testified that when their southern

neighbors have asked, they had always been neighborly and allowed them to use the disputed property. There is sufficient evidence to support this finding of fact because the testimony from the bench trial reflects that the use of the disputed property was with permission of the Hoffman family.

The Staleys argue that the Hoffmans' subjective belief that their southern neighbors used the disputed property with permission is insufficient for this finding of fact. However, the trial court relied on the Hoffman family's testimony in making this finding of fact, not the arguably inconsistent testimony of Cheryl Staley that she and her family never sought permission to use the disputed property. We defer to the trial court's determinations when there is conflicting testimony and do not reweigh credibility determinations. *Curtiss*, 161 Wn. App. at 693.

We determine that all twenty of the trial court's findings of fact to which the Staleys assign error are supported by substantial evidence.

III. ADVERSE POSSESSION

Related to their challenge to the trial court's findings of fact, the Staleys argue that the trial court erred in rejecting their claims for adverse possession. First, the Staleys argue that the trial court erred in its conclusion that they failed to show their predecessors adversely possessed the disputed property starting when the old fence or the 1962 fence were built, or when their predecessors granted the utility easements for the power poles. Second, they argue that the trial court erred in concluding that they failed to prove adverse possession of the driveway. We hold the trial court did not err in concluding that the Staleys failed to prove adverse possession.

"Adverse possession is a mixed question of law and fact." *Maier v. Giske*, 154 Wn. App. 6, 18, 223 P.3d 1265 (2010). "The trier of fact determines whether the essential facts exist, and

the [trial] court determines whether those facts constitute adverse possession." *Id.* On appeal, we "review[] the adverse possession determination de novo, but defer[] to the factual findings made below." *Id.*

To establish a claim of adverse possession, a party must show possession of the claimed property was (1) open and notorious, (2) actual and continuous for the statutory period, (3) exclusive, and (4) hostile. *Id.* Relevant to this case, the statutory period is ten years. RCW 4.16.020. The party asserting adverse possession has the burden of proving its elements by a preponderance of the evidence. *Teel v. Stading*, 155 Wn. App. 390, 394, 228 P.3d 1293 (2010). A preponderance of the evidence means that a fact finder must be persuaded that the facts are "more likely than not." *Anderson v. Akzo Nobel Coatings, Inc.*, 172 Wn.2d 593, 608, 260 P.3d 857 (2011).

A.  ADVERSE POSSESSION BASED ON THE FENCES

The Staleys argue that their predecessors met all the elements of adverse possession of the disputed property based on the fences. They argue that their predecessors adversely possessed the disputed property beginning either when the old straight fence was built or when the 1962 fence was built. We discuss each fence separately.

First, with respect to the old fence, "Finding of Fact" LIV, although labeled a finding of fact, includes the relevant conclusion of law:

> Plaintiffs have failed to establish that this straight fence has any bearing on establishing their claims.

CP at 744.

This finding/conclusion also included the trial court's decision that there was no evidence as to when the old fence was built, or where the fence was located in relation to the deeded property line.[5] Without knowing the location of the old fence, the Staleys cannot use evidence of the old fence to establish the beginning of the time period for adverse possession because the old fence cannot show actual possession of the disputed property. The findings of fact support this conclusion of law; the construction of the old fence does not show adverse possession by the Staleys' predecessors.

Second, with respect to the 1962 fence, the trial court's relevant conclusions of law are contained in "Conclusions of Law" 4, 5, and 6:

> 4. There is no evidence as to when in 1962 the fence was constructed. It is the Plaintiff's burden to show that all of the elements of adverse possession existed for the duration of the ten year period.
>
> 5. The evidence shows that Alfred Hoffman purchased his property in August of 1972 and did not accept the fence line as the boundary from that date, using property on the south side of the cattle fence as his own.
>
> 6. The Plaintiffs' failure to meet their burden and failure to establish a continuous ten year period of adverse use is fatal to their claim.

CP at 745.

Finding of Fact VII makes the exact same assertion as Conclusion of Law 4 that "[t]here is no evidence in the record as to when in 1962 the fence was constructed."[6] CP at 734. This

---

[5] As discussed above, this factual component of Finding of Fact LIV is supported by substantial evidence.

[6] As discussed above, Finding of Fact VII is supported by substantial evidence.

finding of fact alone is sufficient to support Conclusion of Law 4 and its statement that the Staleys have not met their burden of proof.

Unchallenged Finding of Fact XI states that the Hoffmans purchased the north parcel in 1972.[7]   Unchallenged Finding of Fact XII states that at or about the time of purchase, Alfred Hoffman commissioned a survey of the north parcel to mark the property's corners.  And Finding of Fact XV states that Alfred mowed the property south of the fence, removed tansy growing south of the fence, and would pick fruit from the trees that were located south of the fence.[8]   These findings all support that Alfred knew that the fence line was not the property line and immediately began using the disputed property as his own from the time of purchase.  Reviewing Conclusion of Law 5 de novo, we conclude it is supported by the evidence.

Conclusion of Law 6 contains the trial court's conclusion that the Staleys have not met their burden of proof for adverse possession over the disputed property for the required ten-year time period.  This result flows from Conclusions of Law 4 and 5, and the findings of fact that support them.  Because the Hoffmans purchased the north parcel in August 1972 (and immediately thereafter began asserting his ownership over the disputed property), the Staleys would have to show that the 1962 fence was built prior to August 1962 to establish the required ten-year statutory period.  However, because the Staleys fail to show when the 1962 fence was built within that year, the Staleys have failed to show by a preponderance of the evidence that the disputed property was possessed for ten years.  The facts that support Conclusions of Law 4 and 5 also support Conclusion

---

[7] Unchallenged findings of fact are verities on appeal.  *Harris*, 133 Wn. App. at 136.

[8] As discussed above, Finding of Fact XV is supported by substantial evidence.

of Law 6; the evidence about the 1962 fence does not prove adverse possession of the disputed property.

The Staleys have failed to show by a preponderance of the evidence that they meet the statutory minimum time period in their claim for adverse possession of the disputed property based on the fences.

B. ADVERSE POSSESSION BASED ON UTILITY EASEMENTS

The Staleys also argue that utility easements granted by their predecessors prove the elements of adverse possession when the power poles from that easement were placed north of the property line. We disagree.

The trial court did not enter specific conclusions of law about whether the easements are insufficient to show adverse possession. However, Conclusion of Law 3 generally states, "The Plaintiffs have failed to satisfy their burden of proof upon a claim of adverse possession." CP at 744.

Finding of Fact LII states, "[The] easements, and the placement of utility poles, have nothing to do with the fence line, and do not grant the Staleys any right to use or access the Hoffman lot."[9] CP at 743. The utility easements to the power company only conveyed an easement in property located within the south parcel, not the disputed property. An easement that conveys no rights in the disputed property does not show adverse possession by a preponderance of the evidence because it does not show any possession of the disputed property. The fact that the power poles were located on the north parcel, instead of the south parcel, is more consistent

---

[9] As discussed above, Finding of Fact LII is supported by substantial evidence.

with a mistake by the utility company than with an overt assertion of ownership by the south parcel owner. The Staleys' assertion of rights rooted in the utility easements are unpersuasive.

We determine Conclusion of Law 3's general conclusion that the Staleys have not proven adverse possession is sufficiently supported by the findings of fact.

C. ADVERSE POSSESSION BASED ON THE DRIVEWAY

The Staleys further argue that the trial court erred in deciding that use of the south parcel driveway failed to meet the requirements for adverse possession. We disagree.

Conclusion of Law 3 states:

The Plaintiffs have failed to satisfy their burden of proof upon a claim of adverse possession. The evidence does not show that the land south of the 1962 fence has ever actually been used openly and exclusively by the Plaintiffs or their predecessors in interest for at least ten continuous years.

CP at 744-45. The trial court entered this conclusion following the Staleys' motion to clarify, and the conclusion of law appears to apply to the driveway, as well as the rest of the disputed property.

The Staleys argue that Findings of Fact VIII, XV, XXXIV, XXXVII, and LVII all relate to the driveway, and that they "cannot be sustained." Br. of Appellants at 47. But, as discussed above, all of these findings of fact are supported by substantial evidence. Each supports Conclusion of Law 3.

Although each of these findings of fact supports Conclusion of Law 3, Finding of Fact LVII, by itself, is sufficient to conclusively support the trial court's conclusion of law. Finding of Fact LVII states, "Any use made of any portion of the Hoffman lot by the Staleys or their predecessors was with the permission of the Hoffmans or their predecessors as a neighborly accommodation." CP at 744. Because adverse possession cannot take place if the driveway was

36

only ever used with permission, this finding of fact is fatal to the Staleys' claims based on the driveway.[10]

Because the disputed property, including the driveway, was only ever used with the Hoffman family's permission, the Staleys do not meet their burden to show that the use of the driveway amounted to adverse possession. We affirm the trial court's conclusion that the Staleys did not show all elements of adverse possession for the driveway.[11]

## IV. PRESCRIPTIVE EASEMENT

The Staleys alternatively argue that they at least acquired a prescriptive easement over the disputed property. We disagree.

To establish an easement by prescription, "a claimant must prove: (1) use adverse to the title owner; (2) open, notorious, continuous and uninterrupted use for 10 years; and (3) that the owner knew of the adverse use when he was able to enforce his [or her] rights." *Lee v. Lozier*, 88 Wn. App. 176, 181, 945 P.2d 214 (1997). Unlike adverse possession, which only requires proof by a preponderance of the evidence, all elements of a prescriptive easement must be proven by clear and convincing evidence. *Maslonka v. Pub. Util. Dist. No. 1 of Pend Oreille County*, 23 Wn.

---

[10] As noted above, the record also shows that the encroachment of the driveway on the property line did not begin until after the Staleys purchased the south parcel in 2014. Clearly, even if that encroachment was not with the permission of the Hoffmans, it cannot be used to prove adverse possession because it cannot meet the ten-year statutory minimum for adverse possession.

[11] The Staleys further argue that the trial court erred when it did not shift the burden back to the Hoffmans to show they repossessed the disputed property after the Staleys had shown adverse possession. If a party establishes a successful claim of adverse possession, the burden shifts back to the title owner to prove they reclaimed title to the property by their own adverse possession. *See Harris*, 133 Wn. App. at 141. Because the trial court did not find that the Staleys met their initial burden to show adverse possession, this argument lacks merit.

App. 2d 1, 28, 514 P.3d 203 (2022), *petition for review filed*, __ Wn.2d __ . Clear and convincing

evidence is a higher burden than preponderance of the evidence. *Mueller v. Wells*, 185 Wn.2d 1,

10 n.5, 367 P.3d 580 (2016). " 'Prescriptive rights . . . are not favored in the law, since they

necessarily work corresponding losses or forfeitures of the rights of other persons.' " *Gamboa v.*

*Clark*, 183 Wn.2d 38, 43, 348 P.3d 1214 (2015) (alteration in original) (quoting *Nw. Cities Gas*

*Co. v. W. Fuel Co.*, 13 Wn.2d 75, 83, 123 P.2d 771 (1942)).[12]

The trial court's decision on the Staleys' claim for a prescriptive easement is contained in

Conclusion of Law 8, which states:

> The Plaintiffs have failed to satisfy their burden of proof upon a claim of prescriptive easement. There is no credible evidence of any historic use by Plaintiffs or their predecessors in interest of accessing their back field by use of an "upper road" across the Hoffman Lot. The existence of utility easements on either parties' property is irrelevant to this determination.

CP at 745.

At least three findings of fact support this conclusion of law.[13] First, Finding of Fact LVII

states, "Any use made of any portion of the Hoffman lot by the Staleys or their predecessors was

with the permission of the Hoffmans or their predecessors as a neighborly accommodation." CP

at 744. This finding of fact supports the conclusion that the Staleys fail to show a prescriptive

easement because, just as it fails to establish adverse possession, use of the disputed property with

permission of the owners cannot result in a prescriptive easement. Especially given that the

---

[12] The Staleys acknowledge that the elements required to prove they acquired a prescriptive easement are essentially identical to the elements required to prove adverse possession.

[13] As shown above, each of the following three findings of fact is supported by substantial evidence.

standard of proof for the elements of a prescriptive easement is higher than for adverse possession, this permissive use is fatal to the Staleys' claim for a prescriptive easement.

Second, Finding of Fact LVI states, "There is no credible evidence that the Staleys or their predecessors enjoyed an historic use of the upper road to access the lower Staley field to establish a prescriptive right." CP at 744. This finding of fact supports the conclusion that the upper road cannot be used to establish a prescriptive easement because there is no historic use of the upper road.

Third, Finding of Fact LII states, "[The] easements, and the placement of utility poles, have nothing to do with the fence line, and do not grant the Staleys any right to use or access the Hoffman lot." CP at 743. Because the easements only convey an interest entirely within the boundaries of the south parcel, they cannot show any right or use of the disputed property within the north parcel. This finding of fact supports Conclusion of Law 8's conclusion that the utility easements are "irrelevant" to any prescriptive rights.

These three findings of fact establish that the Staleys and their predecessors historically did not use the disputed property in a way that could establish a prescriptive easement. Reviewed de novo, Conclusion of Law 8 is supported by the findings.

Because the Staleys have failed to show by clear and convincing evidence that they have a prescriptive easement over the disputed property, we affirm the trial court on this issue.

V. ATTORNEY FEES

A. TRIAL COURT'S AWARD OF ATTORNEY FEES

The Staleys request that we reverse the trial court's order awarding attorney fees to the Hoffmans because the Staleys should have been the prevailing party below. Because the Hoffmans remain the prevailing party, we affirm the trial court's award of attorney fees to the Hoffmans.

B. ATTORNEY FEES ON APPEAL

Both parties request attorney fees on appeal. RAP 18.1 grants us the ability to award attorney fees if applicable law allows. Attorney fees may be awarded at the appellate level only when authorized by a contract, a statute, or a recognized ground of equity. *Labriola v. Pollard Grp., Inc.*, 152 Wn.2d 828, 839, 100 P.3d 791 (2004). For cases involving claims of adverse possession, RCW 7.28.083(3) provides such a basis by allowing us to grant attorney fees to the prevailing party when doing so would be equitable and just.

Because we affirm the trial court's order in its entirety, the Hoffmans are the prevailing party. Further, given the relative clarity of the issues involved, awarding attorney fees to the Hoffmans for this appeal would be equitable and just. Accordingly, we award attorney fees to the Hoffmans.

CONCLUSION

The trial court did not err when it rejected the Staleys' claims for adverse possession and a prescriptive easement. We affirm. We further award attorney fees for this appeal to the Hoffmans.

No. 55951-0-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

WORSWICK, J.P.T

LEE, J.